**J.D. ABRAMS, INC., Appellant,**

**v.**

**Joyce McIVER, As guardian of the person and estate of Lori Lynette Crane, AIP, Appellee.**

**No. 96–01166–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 12, 1998.

---

Michael J. Cenatiempo, Houston, R. Brent Cooper, J. Stephen Gibson, Michelle Elaine Robberson, Dallas, for Appellants.

David E. Keltner, Fort Worth, Stephen W. Hanks, Houston, Van E. Winner, Stafford, for Appellees.

Before COHEN, O'CONNOR and ANDELL, JJ.

## OPINION

COHEN, Justice.

Appellee sued J.D. Abrams, Inc. (Abrams), Granite Construction Company (Granite), and Daniel Quinlan for negligence arising from an automobile accident. A jury found all three parties were negligent, awarded appellee $13,500,000 in actual damages, and apportioned responsibility as follows: seventy-five percent to Quinlan, twenty percent to Abrams, and five percent to Granite. Abrams and Quinlan were adjudged jointly and severally liable for $16,098,969.40, including prejudgment interest. Only Abrams appeals the judgment.[1] We reverse in part and remand.

1. Granite settled before trial; its liability was submitted to the jury for apportionment of causation. Quinlan entered a rule 11 agreement with Abrams where Abrams agreed to pay the judgment if a joint and several judgment was entered.

2. Joyce McIver is the guardian and mother of Lori Crane.

3. Quinlan was convicted of involuntary manslaughter for killing Crane's passenger by driving while intoxicated.

## FACTS

Daniel A. Quinlan (Quinlan) rear-ended a vehicle driven by Lori Crane (Crane) on Highway 59 at about 2:30 a.m. on October 13, 1990, killing Crane's passenger and physically and mentally incapacitating Crane.[2] Quinlan was speeding and had been drinking that night.[3] The accident occurred on a section of the highway under construction by Abrams. Another section of adjacent highway construction was controlled by Granite.

## ANALYSIS

### Submission of Settling Defendant Liability

In the fourth point of error, Abrams asserts the liability of two of the settling defendants should have been submitted to the jury. Specifically, that Yucatan, Inc. d/b/a Yucatan Liquor Stand (Yucatan) and Ice Embassy, Inc. d/b/a Colorado Bar & Grill (Colorado), who both settled with appellee before trial, should have been included in the jury questions on liability and comparative responsibility.[4]

We review a trial judge's refusal to submit an issue to the jury by determining if there was legally sufficient evidence to support the submission. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992). To determine whether legally sufficient evidence supported Abrams' submission, we must examine the record for evidence supporting Abrams' question and ignore all evidence to the contrary. *Id.*

Abrams's claim for contribution against Yucatan and Colorado is statutory. Tex. Alco.Bev.Code Ann. § 2.03 (Vernon 1995);

4. Regarding the determination of the percentage of responsibility, the law in effect at the time of the accident stated:
 The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility with respect to:
 (1) each claimant;
 (2) each defendant; and
 (3) each settling person.
 Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 Tex.Gen.Laws 37, 41 (amended 1995) (current version at Tex.Civ.Prac. & Rem.Code Ann. § 33.003 (Vernon 1997)).

*Smith v. Sewell,* 858 S.W.2d 350, 351 n. 1 (Tex.1993). The statute states:

> (b) Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action ... upon proof that:
>
> (1) at the time the provision occurred *it was apparent to the provider* that the individual being sold, served, or provided with an alcoholic beverage *was obviously intoxicated* to the extent that he *presented a clear danger* to himself and others; and
>
> (2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

TEX.ALCO.BEV.CODE ANN. § 2.02(b) (Vernon 1995) (emphasis added).

Evidence supporting this cause of action includes:

(1) Quinlan testified that on the night of the accident, he arrived at a Rockets game around 7:30 p.m., where he consumed at least two beers;

(2) From there, Quinlan went to Colorado, where he consumed three drinks over a three hour period;

(3) Quinlan and his friends left Colorado around midnight to go to Yucatan, where he had one gin and tonic;

(4) Quinlan left Yucatan at approximately 1:30 a.m.;

(5) Quinlan had very little or nothing to eat that night;

(6) William Delval, a companion of Quinlan's, testified Quinlan consumed alcoholic beverages at the Rockets game, Yucatan, and Colorado;

(7) The accident occurred at approximately 2:30 a.m.;

(8) Officer Chimney, who investigated the accident, testified when he spoke with Quinlan at the hospital at around 4:45 a.m., he could "smell an odor of an alcoholic beverage on him" and his speech was slurred;

(9) Thomas Olson, an EMT at the accident scene, testified Quinlan was intoxicated at the scene because he had alcohol on his breath, his speech was slurred, and he was acting confused;

(10) Lee Starr, an Abrams employee, testified that, at the accident scene, Quinlan appeared so drunk that he did not know where he was;

(11) Another witness at the accident scene testified Quinlan stumbled away from his car after the impact, seemed confused, was disoriented, and could not stand up;

(12) A sample of Quinlan's urine taken two hours after the accident indicated he had a blood alcohol content (BAC) of .18 percent, indicating approximately a .2 or .22 percent BAC content at the time of the accident;

(13) A toxicologist expert testified this figure indicated Quinlan consumed the equivalent of 15 drinks over the course of the evening;

(14) Another toxicologist testified that a .2 BAC is dangerous and would be a contributing or proximate cause to this accident if Quinlan's BAC was at that level;

Notably missing from this evidence is any testimony that Quinlan was "obviously intoxicated," much less "to the extent he presented a clear danger to himself and others," at the time he was provided alcohol at Yucatan and Colorado, or that such condition was then "apparent" to the provider. *See* TEX. ALCO.BEV.CODE ANN. § 2.02(b).

Abrams relies on *El Chico Corp. v. Poole,* 732 S.W.2d 306 (Tex.1987), for the proposition that evidence of the driver's intoxication at an accident scene occurring a few minutes after leaving a bar was sufficient to raise a fact issue as to the driver's level of intoxication at the bar. *Id.* at 315. When *El Chico* was decided, the law provided that a bar was liable if it "knowingly sells an alcoholic beverage to an intoxicated person." *Id.* at 313. The court reversed summary judgment because evidence of the driver's intoxication at the scene created a fact issue for the jury. *Id.* at 315.

Notably, the law controlling this case (TEX.ALCO.BEV.CODE ANN. § 2.02(b)) is much more favorable to alcohol providers than the law in effect for *El Chico. El Chico,* 732 S.W.2d at 314 (court did not apply section

2.02 because cause of action accrued before its passage). The court in *El Chico* emphasized that the burden of proof under section 2.02 was "much more onerous" because a plaintiff had to prove "it was *apparent* that the individual being … served … was *obviously* intoxicated to the extent he presented a *clear danger* to himself·and others." *Id.* (citations and internal quotations omitted) (emphasis and ellipses in original). In *El Chico,* the driver testified he was an alcoholic, he forgot the incidents leading up to the accident because of his inebriation, that the number of beverages he consumed was sufficient to cause a black-out, and, perhaps most important, that the accident occurred minutes after leaving the bar. *Id.* at 308.

The facts in this case are distinguishable from *El Chico.* Though there was testimony of Quinlan's intoxication at the accident scene, the accident occurred a full hour after Quinlan left Yucatan, and two and one-half hours after he left Colorado. The accident in *El Chico* occurred minutes after the driver left the bar. No evidence showed Quinlan was "obviously intoxicated" at either Yucatan or Colorado to the extent that he presented a "clear danger" to himself and others, and none showed that fact "was apparent to the provider" when provision occurred. In *El Chico,* the driver admitted he consumed enough alcohol at the bar to black out. *Id.* at 308.

We hold there was no evidence supporting submission of Yucatan's and Colorado's liability under section 2.02 to the jury.

We overrule the fourth point of error.

### Sufficiency of the Evidence

In points of error one and two, Abrams asserts there was no evidence or factually insufficient evidence to prove Abrams was negligent. In points of error five and six, Abrams complains the evidence was legally and factually insufficient to prove Abrams was twenty percent negligent.

#### *No Evidence*

■ When reviewing a no evidence point, we "must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences." *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992). Using this standard, the following evidence supported the jury's finding:

1. Abrams controlled a construction project on Highway 59 where the accident occurred;

2. In addition to Quinlan, at least eight motorists who were traveling on that section of Highway 59 near the time of the accident did not see any signs warning of a construction zone, traffic delays, or possible sudden stops;

3. Several motorists testified that they never expected to come to such an abrupt stop, and that the traffic came to a complete stop in the area of the accident scene because of the construction;

4. At least three other rear-end accidents occurred in the same area and the same evening as Crane's accident. The first was two and one half hours before Crane's accident, and the last was approximately one half hour before Crane's accident;

5. A wrecker driver tending to one of the prior accidents testified that the traffic created "an excellent situation for another accident";

6. Richard Phillips, Abrams's traffic control officer, did not recall whether construction warning signs were placed for the benefit of traffic entering Highway 59 at the Kirby Street entrance ramp;

7. Quinlan entered Highway 59 from the Kirby Street entrance ramp;

8. The section of the highway under construction by Granite was located immediately after the section of highway where Crane's accident occurred;

9. Though Abrams claims the traffic back-up was caused by Granite, Phillips saw no evidence of traffic backing up from Granite's section into Abrams's section the night of the accident;

10. The State's contract with Abrams required that the work being done take place behind concrete traffic barriers (CTBs);

11. Abrams performed the work behind traffic barrels instead of CTBs;

12. By separating workers from traffic, CTBs allow more lanes to remain open for traffic than when traffic barrels are used;[5]

13. Abrams' engineer for the construction project, Lester Shimonski, admitted CTBs were being used on other parts of the construction project, that CTBs were required for the entire project, and that CTBs were the safer than traffic barrels.

Considering this evidence supporting the verdict, we now turn to Abrams' specific no evidence complaints.

## 1. Evidence of Standard of Care or Breach.

In the first point of error, Abrams asserts appellee failed to present expert testimony to establish the standard of care applicable to Abrams, a highway construction company "performing sophisticated operations," or to establish a breach of that standard of care.

■ Some cases require expert testimony to establish a violation of the standard of care because the alleged negligence is not within the common experience of the average layman. *See Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982) (diagnosing a skull fracture); *Penick v. Christensen*, 912 S.W.2d 276, 284 (Tex.App.—Houston [14th Dist.] 1995, writ denied) (hip replacement surgery); *Hager v. Romines*, 913 S.W.2d 733, 734–35 (Tex. App.—Fort Worth 1995, no writ) (flying an airplane and aerially applying herbicide); *Parkway Co. v. Woodruff*, 857 S.W.2d 903, 919 (Tex.App.—Houston [1st Dist.] 1993), *aff'd as modified*, 901 S.W.2d 434 (Tex.1995) (design of a retaining wall). These cases dealt with issues that obviously required experts to fully develop the appropriate standard of care. We would not expect the average layman to understand or have experience diagnosing skull fractures, performing hip replacement surgery, crop dusting, or designing retaining walls.

■ This case involved an automobile accident in a road construction area. Driving an automobile in areas of road construction and automobile accidents certainly are not outside of the understanding of the average layman. Further, the appropriate placement of construction warning signs and the differences between traffic barrels and CTBs are not so complex as to require the explanation of an expert to fully develop the appropriate standard of care. We do not doubt specialized equipment or construction techniques were in use at the time of this accident. However, these elements were not at issue in the accident itself. Thus, appellees were not required to present expert testimony to establish the appropriate standard of care for Abrams.[6] Expert testimony was also not required to establish Abrams breached this standard of care.

## 2. Breach of Independent Tort Duty

■ In the first point of error, Abrams asserts no evidence supported the finding of its alleged negligence because evidence adduced by Abrams focused only on Abrams's alleged breach of contract, which, by itself, is insufficient to support a negligence claim.

---

5. Quincy Allen, who worked for the Department of Transportation, testified at trial that CTBs would not have prevented the lane closures the night of the accident because of the type of work being performed. The jury heard his deposition, however, in which he testified that if CTBs would have been used, fewer lanes of traffic would have been closed. Richard Diffley, a project manager for Abrams at the time of the accident, testified that traffic barrels require an extra lane as a buffer between the workers and the traffic that CTBs do not.

6. If expert testimony was required, there was some. Quincy Allen, who worked for the Department of Transportation, testified that if CTBs would have been used, fewer lanes of traffic would have been closed. Further, Richard Diffley, a project manager for Abrams at the time of the accident, testified that traffic barrels require an extra lane as a buffer between the workers and the traffic that CTBs do not. Lester Shimonski's testimony summarized at item 13 on page 9 of this opinion is some expert testimony of the standard of care. Finally, the contract requiring Abrams to use CTBs is some evidence of the standard of care.

*See Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494–95 (Tex.1991) (when only loss or damage is to subject matter of contract, action is ordinarily on the contract). We disagree. In addition to the evidence of Abrams's alleged breach of contract, appellee presented evidence that no road construction warning signs were in place, that Abrams was required to put up adequate signs to ensure traffic safety, and that regardless of the contract requirement, CTBs were safer to use than traffic barrels. This evidence, notwithstanding evidence of Abrams's alleged breach of contract, is legally sufficient to support the negligence verdict.

### 3. Evidence of Proximate Cause

■ In the first point of error, Abrams asserts that there was no evidence to establish Abrams was the proximate cause of the accident. The test for cause in fact is "whether the negligent act or omission was a substantial factor in bringing about injury, without which the harm would not have occurred." *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Abrams relies on Quinlan's conduct for support.[7] However, like the eight motorists who testified they saw no construction warning signs, Quinlan himself saw no construction warning signs that evening, and he testified that if he had, he would have slowed down. Further, had CTBs been used instead of traffic barrels, more lanes would have remained opened, thus eliminating the need for complete traffic stoppages and reducing the need for traffic slow-downs. If more lanes had been open, or traffic had been moving faster in the open lanes, both the probability of this accident and its likely severity would have been reduced. These facts, as well as the facts enumerated above, support the conclusion that there was legally sufficient evidence that Abrams's conduct was a substantial factor in the cause of Crane's damages.

Abrams relies on *Union Pump v. Allbritton,* 898 S.W.2d 773 (Tex.1995), *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470 (Tex.1991), and *Bell v. Campbell,* 434 S.W.2d 117 (Tex.1968), for the proposition that because the direct effects of the lane closure had already ended by the time the accident occurred, the lane closure was not the cause-in-fact of the accident. Abundant evidence showed that the effects of the lane closure had not ended (*i.e.,* traffic came to a complete stop immediately prior to Crane's accident), and that they caused this accident in a much more direct causal sequence than was present in the cases cited above.

### 4. Evidence Abrams Twenty Percent Negligent

■ In the fifth point of error, Abrams asserts there was no evidence it was 20% negligent. In support of this argument, Abrams reasserts the same arguments and authorities above. For the same reasons stated above, the evidence was legally sufficient to support a finding that Abrams was twenty percent negligent.

### *Factual Sufficiency*

■ In the second and sixth points of error, Abrams asserts the evidence was factually insufficient. In reviewing a factual sufficiency point of error, this Court must consider and weigh all of the evidence in the case and determine "whether the evidence is insufficient or if the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986).

### 1. Witness Starr's Testimony

■ In the second point of error, Abrams complains that the testimony of Lee Starr, standing alone, is factually insufficient to support the jury's verdict. Starr testified Quinlan traveled within Abrams's construction zone before the accident. Whether Quinlan entered the construction zone was not an ultimate issue. Numerous motorists testified there were insufficient construction

---

7. Abrams cites portions of the record indicating Quinlan's urine showed a blood alcohol content of approximately .2 percent at the time of the accident and that he was traveling 77 to 92 miles per hour. Under the no evidence standard, we do not consider this evidence. Other testimony indicated the blood alcohol testing procedure was inaccurate, that Quinlan appeared sober at the accident scene, and that he was traveling 65 miles per hour.

warning signs. Even if the jury did not believe Starr, that does not make the abundant evidence of Abrams's negligence factually insufficient. The evidence was factually sufficient.

### 2. Sufficiency of Twenty Percent Negligence Finding

 In the sixth point of error, Abrams asserts the evidence was factually insufficient to support a finding that Abrams was twenty percent negligent. Specifically, Abrams asserts evidence of Quinlan's intoxication, Granite's role in causing traffic problems, and evidence of Abrams's own safety precautions precludes a finding of twenty percent liability. For each point Abrams asserts, however, contradicting evidence was presented.

With regard to Quinlan's level of intoxication discussed above, there was testimony that the percentage of alcohol determined by the urine test was inaccurate, that Quinlan's slurred speech and unsteady appearance at the accident scene may have been caused by the head injury he received in the accident, testimony by Quinlan and Delval [8] that Quinlan had no more than seven drinks over the seven hour period leading up the accident, and testimony that Quinlan did not smell of alcohol at the scene of the accident.

Abrams asserts it fully complied with State safety standards. To support this conclusion, Abrams cites oral testimony regarding a claimed written amendment to its contract with the State allowing Abrams to use traffic barrels instead of CTBs. This amendment was never found, naturally it was not admitted in evidence, and other testimony suggests the amendment did not exist until after the accident. Abrams also asserts it set up adequate warnings of the construction zone, but as recited above, numerous witnesses testified they saw no construction warning signs leading up to the accident scene.

Finally, Abrams asserts Granite caused the traffic back-up into Abrams's section of the highway. Abrams cites testimony that Granite was engaging in certain "pacing maneuvers" to close traffic lanes and particular

exits. However, other testimony, as recited above, stated that Granite never caused a traffic backup the night of the accident.

We overrule the first, second, fifth and sixth points of error.

### Negligence Definition

In the third point of error, Abrams asserts the trial court submitted a defective definition of negligence to the jury. Specifically, Abrams asserts the judge should have used a higher standard, the ordinary prudent construction company standard, rather than ordinary negligence. Abrams did not object on this basis at trial. Thus, nothing is preserved for review. TEX.R.APP.P. 33.1(a); TEX.R.CIV.P. 278.

We overrule the third point of error.

### Jury Vote Violation

 In the seventh point of error, Abrams asserts the jury's vote violated rule 292 of the Texas Rules of Civil Procedure because the same 10 jurors did not vote for each answer given.

Rule 292 provides, "A verdict may be rendered in any cause by the concurrence, as to each and all answers made, of the same ten members of an original jury of twelve...." TEX.R.CIV.P. 292.

Here, the jury was instructed that the same ten jurors must agree on all answers. There is no indication how many jurors agreed on the assignment of liability or the calculation of damages, however, 10 of the jurors signed the verdict form. Abrams moved to have the jury polled, and the judge asked each juror whether this was his/her answer to the questions. The same 10 jurors who signed the verdict form answered in the affirmative. Abrams did not object to the judge's question. The judge then ordered the verdict be filed with the clerk.

 In a motion for new trial, Abrams introduced two juror affidavits, taken almost one month after the judgment was entered, stating that the jurors who agreed on the percentage of liability question were not the same 10 jurors who agreed on the damages

8. Delval accompanied Quinlan to the various bars the night of the accident.

question. Abrams contends that if the trial judge had asked each juror every question in the verdict form, any error in the vote would have been discovered and the jury could have continued deliberations. Abrams, however, did not object to the way the questions were asked. Thus, any error was waived. Further, juror affidavits on the allocation of votes to each issue are insufficient to impeach a verdict where the jury was properly instructed, no evidence of juror misconduct was presented, and the appropriate number of juror signatures were on the verdict form. *See Jones v. Square Deal Cab Co.,* 506 S.W.2d 855, 856 (Tex.1974). The jury here was properly instructed, there was no evidence of juror misconduct, and 10 jurors signed the verdict form as required. Finally, the judge did not have to believe the affiants, and we presume he did not.

We overrule the seventh point of error.

### Judgment Calculation

■ In the eighth point of error, Abrams asserts the trial judge erred in calculating the judgment by improperly apportioning settlements and failing to give full settlement credits with respect to all claimants and settling defendants.

The judgment awarded $13,500,000 against Abrams. Granite settled before trial for $1,737,175.00. The judge allocated twenty-five percent of that amount to Joyce McIver for her individual claims, and seventy-five percent ($1,302,881.20) to Lori Crane for her claims. Yucatan settled before trial for $700,000. The judge allocated 40% to McIver for her individual claims and sixty percent ($420,000) to Crane. Colorado settled before trial for $60,000, all of which went to Crane. Abrams elected to have the judgment reduced by the sum of all settlements, as provided by TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997). Accordingly, the judge granted a settlement credit of $1,782,-881.20 ($1,302,881.20 + $420,000 + $60,000), the total of Crane's settlements.

Abrams claims the judge should have credited the full amount of the settlements, including the money allocated and paid to McIver. Abrams contends this result is required by sections 33.011(1) and 33.012(b) of the Civil Practice and Remedies Code. The issue appears to be one of first impression. Able counsel have cited no case law.

Section 33.012(b) provides:

> If *the claimant* has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by *the claimant* with respect to a cause of action by credit equal to ...
>
> (1) the sum of the dollar amount of *all* settlements; ....

TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997) (emphasis added). Moreover, a claimant is defined as:

> [A] party seeking recovery of damages pursuant to the provisions of Section 33.001, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff seeking recovery of damages. *In an action in which a party seeks recovery of damages for injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery* of damages pursuant to the provisions of Section 33.001.

TEX.CIV.PRAC. & REM.CODE ANN. § 33.011(1) (Vernon 1997) (emphasis added).

This lawsuit included both a plaintiff (McIver) who "[sought] recovery of damages for injury to another person," and another party (Crane) who "[sought] recovery of damages pursuant to the provisions of section 33.001." *See id.* Thus, "claimant," as it is used in section 33.012, included both McIver and Crane. Accordingly, "all settlements" entered into by "the claimant" included the settlements of both McIver and Crane. We therefore hold that the trial judge should have granted settlement credits to Abrams for the full amount of the Yucatan and Granite settlements.

Appellee contends this construction of the statute would require a settlement credit for money paid to unrelated parties in the suit, such as the survivors and the estate of Carrie Johnson, a passenger killed in Crane's car. We disagree. We assume those plaintiffs also settled for injuries "to another person,"

but that person was Johnson, not Crane. Whatever settlement they received would be credited against a judgment for Johnson. It cannot be credited against the judgment for Crane.

Crane also contends that this result would make her give a credit for money she never received, money that by court order went to another person, McIver, for McIver's own losses. While that is true, we believe the legislature intended this result in order to protect defendants from plaintiffs who would manipulate settlements among those "seek(ing) recovery of damages for injury to another person."

Though this result may seem harsh, it includes some benefits for a plaintiff like Crane. Without this construction of the statute, a nonsettling defendant, like Abrams, will have standing and motive to litigate the allocation issue at the settlement hearings, thus interfering with agreements reached and ready to be executed by the plaintiffs and settling defendants. Our construction deprives the nonsettling defendant of that interest and motive to meddle in others' affairs by granting it a full credit. Thus, while a plaintiff like Crane suffers a credit for money paid to another, she obtains the benefit of being able to settle her case with other defendants without the delay, the expense, and the risk of having a hearing at which a nonsettling defendant like Abrams contests the allocation of settlement money.

Point of error eight is sustained. The final judgment should reflect a settlement credit for the total amount of the Crane and McIver settlements with Granite, Yucatan and Colorado. Therefore, the final judgment should be reformed to $11,002,825.00 (eleven million two thousand eight hundred twenty-five dollars) [9] plus prejudgment and post-judgment interest.

### Cross–Point

▇ In one cross-point of error, the attorney ad litem for Crane asserts he is entitled to attorney's fees and costs on appeal.

We review the trial judge's determination of ad litem compensation using the abuse of discretion standard of review. *Brownsville–Valley Regional Med. Ctr., Inc. v. Gamez*, 894 S.W.2d 753, 756 (Tex.1995).

▇ Appointment of an ad litem is required if a ward is represented by a guardian who may have an adverse interest. *See* TEX. R.CIV.P. 173. The ad litem is entitled to a reasonable fee for his services, to be taxed as part of the costs. *Id.* This includes reasonable attorney's fees and expenses on appeal. *See Cahill v. Lyda*, 826 S.W.2d 932, 933 (Tex.1992). Once the conflict between the ward and her guardian ends, however, the need for an ad litem ends. *Brownsville–Valley*, 894 S.W.2d at 755.

▇ On appeal, there is no apparent conflict between Crane and McIver. The only contested issue was the damage award in favor of Crane. McIver was awarded nothing in her individual capacity and does not contest that award on appeal. Thus, we hold the trial judge did not abuse his discretion.

We overrule the sole cross-point of error.

### CONCLUSION

We reverse the judgment of the trial court as it pertains to the settlement credit. We remand the cause to the trial court with instructions to allow a settlement credit in the amount of $2,497,175.00 (the sum of the total amounts of the Yucatan, Colorado, and Granite settlements in favor of McIver and Crane), and to recalculate prejudgment interest on the damages awarded. In all other respects, the judgment is affirmed.

---

9. Calculated as:

| | $13,500,000 | Total compensatory damages |
|---|---|---|
| – | $1,737,175 | Granite settlement |
| – | $ 700,000 | Yucatan settlement |
| – | $ 60,000 | Colorado settlement |
| | $11,002,825 | Total |