**BROWN & ROOT INC. n/k/a Kellogg–Brown & Root, Appellants,**

**v.**

**Shearon SHELTON, Appellee.**

**No. 12–01–00259–CV.**

Court of Appeals of Texas, Tyler.

July 31, 2003.

David J. White, David L. Patterson, Steven T. Polino, Godwin Gruber, L.L.P., Dallas, for appellants.

Jeffrey B. Simon, Daryl L. Moore, Houston, for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and RAMEY, Jr., Retired Chief Justice, Twelfth Court of Appeals, Tyler, sitting by assignment.

## OPINION

JAMES T. WORTHEN, Chief Justice.

Brown & Root, Inc., now known as Kellogg Brown & Root, Inc. ("Brown & Root"), appeals the trial court's judgment entered in favor of Shearon Shelton ("Mrs. Shelton"). Brown & Root raises four issues on appeal. We modify the judgment of the trial court and affirm as modified.

## BACKGROUND

John Shelton ("Mr. Shelton") was a thirty-year employee of the Kelly–Springfield tire plant ("Kelly–Springfield") located in Tyler, Texas. From 1969 until 1971, Kelly–Springfield contracted with Brown & Root as a general contractor to construct certain renovations and additions at its plant. During this construction, asbestos-laden materials were used in various forms on multiple expansion projects, which included the construction of a new cafeteria addition, new pipelines in the plant, the application of fireproofing and the installation of insulation. In September of 1999, Mr. Shelton was diagnosed with mesothelioma and was forced to retire. In January of 2000, Mr. and Mrs. Shelton filed a personal injury action against Brown & Root and fourteen other defendants. Other than Brown & Root, all defendants settled prior to the conclusion of trial. Mr. Shelton died after settlement but before the close of trial, and Mrs. Shelton chose to proceed in her individual capacity only.

At trial, Mrs. Shelton introduced Mr. Shelton's deposition testimony concerning his exposure to asbestos from Brown & Root's activities at the Kelly–Springfield Plant such as installing asbestos-containing insulation, cutting gaskets, and cutting rope packing. Two of Mr. Shelton's co-workers also testified extensively about Brown & Root's activities as a general contractor during the period in question. Both stated that workers in Mr. Shelton's position were exposed to asbestos from such acts as the application of fireproofing, insulation, cement, and plaster, all of which contained asbestos. Additionally, the record reflects that at a date much earlier than 1971, Brown & Root became aware of the hazards posed by the use of asbestos and even took measures to alleviate this risk at some of their work sites.

Prior to the close of trial, Mr. and Mrs. Shelton entered into settlements totaling $3,951,900 with the other fourteen defendants. Brown & Root subsequently made a timely request for a dollar-for-dollar settlement credit for the sum total of those settlements. At the close of Mrs. Shelton's case, Brown & Root made a motion for a directed verdict based on the contractor's statute of repose.[1] Brown & Root's motion was denied by the trial court.

On January 22, 2001, the jury returned a verdict against Brown & Root in the amount of $2,766,000 in actual damages and $1,250,000 in punitive damages. Brown & Root was given a $70,000 settlement credit.[2] Again based on the statute of repose, Brown & Root made a motion for judgment notwithstanding the verdict. The trial court denied Brown & Root's motion and entered judgment in favor of Mrs. Shelton. Brown & Root subsequent-

1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.009(a), (b) (Vernon 1997).

2. In a ninety to ten percent split, the settlement amounts were divided between Mr. and Mrs. Shelton such that Mrs. Shelton received only $395,190 of the total amount. This amount was allocated as $325,000 for a claim of loss of inheritance and $70,000 for loss of consortium, mental anguish, and loss of household services. It was for this $70,000 amount that the trial court gave Brown & Root a settlement credit.

ly filed a motion for a new trial which was denied on September 9, 2001. This appeal followed.

## CONTRACTOR'S STATUTE OF REPOSE

In its first issue, Brown & Root contends that the trial court erred in failing to grant its motion for a directed verdict and motion for judgment notwithstanding the verdict because the statute of repose applies and protects Brown & Root from liability.

### Standard of Review

An appeal from the denial of a motion for directed verdict is in essence a challenge to the legal sufficiency of the evidence. *Haynes & Boone, L.L.P. v. Chason,* 81 S.W.3d 307, 309 (Tex.App.-Tyler 2002, pet. denied); *Lochinvar Corp. v. Meyers,* 930 S.W.2d 182, 187 (Tex.App.-Dallas 1996, no writ). Likewise, a motion for judgment notwithstanding the verdict should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227–28 (Tex.1990); *see also Brookshire Bros., Inc. v. Wagnon,* 979 S.W.2d 343, 351 (Tex.App.-Tyler 1998, pet. denied) (a review of a judgment notwithstanding the verdict and a directed verdict are subject to the same standard). On review, this court will consider only the evidence and inferences tending to support the trial court's decision, and disregard evidence and inferences to the contrary. *Minyard Food Stores, Inc. v. Goodman,* 80 S.W.3d 573, 577 (Tex.2002); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). A motion for a directed verdict should be granted when, viewing the evidence in the light most favorable to the non-movant, there is no more than a scintilla of evidence that would defeat the movant's entitlement to judgment as a matter of law. *See Trinity Indus., Inc. v. Ashland,* 53 S.W.3d 852, 862 (Tex.App.Austin 2001, no pet.).

### Applicable Law

Section 16.009 of the Texas Civil Practice and Remedies Code provides as follows:

A claimant must bring suit for damages for a claim listed in Subsection (b) against a person who constructs or repairs an improvement to real property not later than ten years after the substantial completion of the improvement in an action arising out of the defective or unsafe condition of the real property or a deficiency in the construction or repair of the improvement.

TEX. CIV. PRAC. & REM.CODE § 16.009(a). By enacting this statute of repose, the Legislature sought to protect contractors who install such improvements from a perpetual threat of liability. *See Petro Stopping Ctrs., Inc. v. Owens-Corning Fiberglas Corp.,* 906 S.W.2d 618, 620 (Tex.App.El Paso 1995, no writ). If applicable, the statute of repose "provides a complete defense to a personal injury action based on strict liability or negligence." *Reames v. Hawthorne-Seving, Inc.,* 949 S.W.2d 758, 761 (Tex.App.-Dallas 1997, writ denied).[3]

### Analysis

A defendant seeking to invoke the statute of repose must satisfy two underlying

---

**3.** Mrs. Shelton argues that Brown & Root is not entitled to use the statute of repose as a defense based on Brown & Root's argument at trial that it was not, in fact, the contractor who performed the work in question. As Brown & Root correctly points out, however, its denial does not then bar a subsequent invocation of the statute of repose as the "Texas Rules of Civil Procedure allow alternative pleading even of inconsistent theories." *Brown v. Goldstein,* 685 S.W.2d 640, 642 (Tex. 1985). Hence, Brown & Root was entitled both to argue its role as contractor and to plead, in the alternative, that if it is found to be the contractor, it is protected by the contractor's statute of repose.

requirements. "First, the defendant must be one who constructs or repairs. Second, that which the defendant constructs or repairs must be an improvement to real property." *Williams v. U.S. Natural Resources,* 865 S.W.2d 203, 206 (Tex.App.-Waco 1993, no writ). A defendant who satisfies only one of these requirements is not protected by section 16.009. *Id.* at 207. Both parties acknowledge that Brown & Root is "one who constructs or repairs." Therefore, the applicability of the statute of repose turns on whether the construction performed by Brown & Root constitutes an improvement to real property. Before personalty can be considered an improvement, it must be annexed to realty.[4] *Sonnier v. Chisholm-Ryder Co., Inc.,* 909 S.W.2d 475, 479 (Tex.1995).

**Annexation**

■ Three factors are relevant in determining whether personalty has been annexed to realty. *See Logan v. Mullis,* 686 S.W.2d 605, 607 (Tex.1985); *Fenlon v. Jaffee,* 553 S.W.2d 422, 428 (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.). These factors include (1) the mode and sufficiency of annexation, either real or constructive, (2) the adaptation of the article to the use or purpose of the realty, and (3) the intention of the party who annexed the chattel to the realty. *Logan,* 686 S.W.2d at 607; *see also O'Neal v. Quilter,* 111 Tex. 345, 234 S.W. 528, 529 (Tex.1921). The third of these criteria "is preeminent, whereas the first and second criteria constitute evidence of intention." *Logan,* 686 S.W.2d at 607; *Fenlon,* 553 S.W.2d at 428–29. Though, as a general rule, the existence of such an intent to annex would be "a ques-

tion of fact for the trier of fact, ... it becomes a question of law where reasonable minds could not differ on the issue of intent." *White v. CBS Corp.,* 996 S.W.2d 920, 924 (Tex.App.-Austin 1999, pet. denied); *see also Sonnier,* 909 S.W.2d at 487; *Logan,* 686 S.W.2d at 607.

An intent to make improvements a fixture may be conclusively established by conduct at the time of the improvements including the adaptation of the personalty to the realty. *See Logan,* 686 S.W.2d at 608. Thus, such factors as the permanency of any attachment and the modification of personalty to fit a specific design may be considered to determine intent. *Id.; Fuentes v. Continental Conveyor & Equip.,* 63 S.W.3d 518, 521 (Tex.App.-Eastland 2001, pet. denied). Such adaptation " 'of the personalty to the use or the purpose of the realty' [is] evidence of the owner's intent" to effect annexation. *Fuentes,* 63 S.W.3d at 521 (quoting *Sonnier,* 909 S.W.2d at 479).

Here, Brown & Root applied fireproofing to the ceiling of the plant, installed pipe insulation and gaskets adapted to fit the layout of Kelly–Springfield's plant, built an expansion of the cafeteria in accordance with Kelly–Springfield's design, and installed new tire machines in the factory, each of which is an action analogous to those in *Fuentes* and *Logan. See Fuentes* 63 S.W.3d at 521; *Logan,* 686 S.W.2d at 608. Consequently, Brown & Root's actions, its adaptation of the items to the use and purpose of the Kelly–Springfield plant, and the "mode and sufficiency" of the construction's joinder to the realty similarly evidence an intent to effect annexation. *See White,* 996 S.W.2d at 924; *see also*

---

4. With the possible exception of the renovation of, and addition to, the cafeteria, the various acts of construction before us each involve personalty. As for the cafeteria, neither party explains to a sufficient degree, nor does the record clearly indicate, to what ex-

tent that portion of the project would not be considered personalty. Even if it did not constitute personalty, however, this issue would not be resolved because the other acts of construction all involve personalty and are, therefore, subject to the *Sonnier* analysis.

*Logan,* 686 S.W.2d at 608. Thus, we conclude that the personalty at issue was annexed to realty.

### Improvements

■ "An improvement includes all additions to the freehold except trade fixtures that can be removed without injury to the property." *Reames,* 949 S.W.2d at 761; *see also Sonnier,* 909 S.W.2d at 479. Additionally, those things which are classified as improvements constitute a more expansive class than does the class of fixtures, which are items of personalty that are "permanently attached to the realty." *Reames,* 949 S.W.2d at 761. "Therefore, although all improvements are not necessarily fixtures, any fixture, unless it is a trade fixture, is considered an improvement."[5] *Id.*

In examining whether asbestos-containing materials are "improvements" under a similar Mississippi statute of repose, the Fifth Circuit noted that "the term improvement must be given its customary meaning ... generally ... a permanent addition that increases the value of the property and makes it more useful." *Trust Co. Bank v. U.S. Gypsum Co.,* 950 F.2d 1144, 1152 (5th Cir.1992). Applying this standard, the court held that asbestos fireproofing materials, similar to those in the present case, constituted "an improvement to real property within the customary meaning of the term." *Id.* Stating the definition even more broadly, the court in *Fuentes* held that a contractor who was required merely to "supervise and assist" in the installation of an improvement had "constructed" an improvement within the meaning of section 16.009. *Fuentes,* 63

S.W.3d at 521; *see also Reames,* 949 S.W.2d at 763.

Within this broadly-defined context, we conclude that the construction done by Brown & Root, after annexation, constituted an improvement. However, given the evidence that at least some of Mr. Shelton's exposure to asbestos occurred prior to annexation, the fact that it can be established that there was annexation and an "intent to effect an improvement as a matter of law ... is not the end of the matter." *White,* 996 S.W.2d at 924.

### Pre–Annexation Exposure

■ In *White,* the plaintiff contracted mesothelioma after workplace exposure to asbestos. Though Mr. White's exposure came through "the course of his work on and around industrial turbines that [the defendant] designed, manufactured, and installed for Mr. White's employer," the court held that the contractor's statute of repose was not applicable. *Id.* at 921.

Although there was little doubt that the objects installed by the defendant in *White* were, after annexation, improvements to real property,[6] the court held that application of the statute of repose was not proper given that the defendant had not conclusively established that Mr. White's "only exposure occurred after the asbestos had been incorporated into the turbines and annexed to the realty so as to constitute an improvement." *Id.* at 925 (emphasis omitted). The court thus drew a distinction between exposure to asbestos that occurred prior to annexation and that which occurred subsequent to annexation. *Id.* Based on the evidence that Mr. White worked around the turbines while they

---

**5.** Neither party contends that the issue of trade fixtures is applicable to this case.

**6.** This determination was based on the fact that the turbines were designed for a specific

function and place and that the installation was done in accordance with the owner's stipulations. *White,* 996 S.W.2d at 924.

were being installed, the court stated as follows:

> Nothing in the record suggests that the City intended that the turbines be "joined" or "annexed" to the realty, in a constructive sense, before being installed; and the record suggests affirmatively by the very fact that the turbines were not installed until after Mr. White came to work at the two plants, that they had not been actually annexed before his exposure.

*Id.* (emphasis omitted). Consequently, because there was evidence to suggest that Mr. White was exposed to asbestos prior to annexation, the protection of section 16.009 had not yet attached and White's action, therefore, was not barred by the statute of repose. *Id.*

Similarly, the evidence presented here indicates that Mr. Shelton's exposure also occurred, at least partially, prior to annexation. Much of the construction in question did not commence until after Mr. Shelton began work at Kelly–Springfield. Additionally, Brown & Root engaged in pre-annexation activity such as mixing asbestos-containing fireproofing, mixing refractory mix, sawing pipecover, and removing old gaskets in the presence of Mr. Shelton and other workers. The uncontroverted testimony of Mr. Shelton and other workers establishes that such activity created asbestos-laden dust, that workers, including Mr. Shelton, were forced to breathe this dust, and that such occurrences took place during pre-installation and pre-construction phases. As such, these pre-annexation occurrences do not fall under the protection of the statute of repose. *See id.*

Brown & Root argues that in *White* the court simply "missed the mark." In support of its argument, Brown & Root cites *Abbott v. John E. Green Co.*, 233 Mich. App. 194, 592 N.W.2d 96 (1998), which addressed Michigan's version of a contractor's statute of repose.[7] Rejecting the argument that the statute of repose applied only post-annexation and not to any activities prior, the court held that the Michigan statute was intended to be applied to the construction process as a whole, and not simply to acts resulting in annexation. *Abbott*, 592 N.W.2d at 101 n. 2 (citing *Pendzsu v. Beazer East, Inc.*, 219 Mich. App. 405, 557 N.W.2d 127 (1996)(holding that the Michigan statute protects defects in the process of workmanship)). Because the court held that the Michigan statute protected the entirety of the process, annexation of the construction was not a question that court found relevant. *Id.* at 101.

Annexation, however, has long been a critical inquiry under the Texas statute. *See Sonnier*, 909 S.W.2d at 479, 482 (legislative history of Texas statute indicates that section 16.009 was intended to protect only those who annex personalty to realty); *see also Logan*, 686 S.W.2d at 607; *White*, 996 S.W.2d at 924; *Fuentes*, 63 S.W.3d at 520–21; *Fenlon*, 553 S.W.2d at 428. Annexation becomes the critical inquiry be-

---

**7.** The Michigan statute of repose provides as follows:

> No person may maintain any action to recover damages … for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, … against any contractor making the improvement, more than 6 years after the time of occupancy of the completed improvement, use, or acceptance of the improvement, or 1 year after the defect is discovered or should have been discovered, provided that the defect constitutes the proximate cause of the injury … and is the result of gross negligence on the part of the contractor….

*Abbott*, 592 N.W.2d at 98–99 (citing M.C.L. § 600.5839(1)).

cause "an improvement requires annexation to realty, and ... until something is annexed to realty, it cannot be considered an improvement." *Fuentes*, 63 S.W.3d at 520; *Sonnier*, 909 S.W.2d at 479. If there is no improvement, then the statute of repose does not apply. *Fuentes*, 63 S.W.3d at 520; *Sonnier*, 909 S.W.2d at 479. Hence, given both the essential differences in language between the two statutes and their divergent history and objectives, *Abbott* is inapposite.

The evidence establishes that Mr. Shelton's exposure to asbestos occurred, at least in part, prior to the annexation of the asbestos-containing materials, and therefore prior to the point at which these materials became improvements. Consequently, because section 16.009 does not apply to any pre-annexation exposure, we hold that the trial court did not err in denying Brown & Root's motion for a directed verdict and its motion for judgment notwithstanding the verdict. Brown & Root's first issue is overruled.

### GROSS NEGLECT

In its second issue, Brown & Root challenges the legal sufficiency of the evidence to support the jury's finding of gross neglect.

#### Standard of Review

The evidence is sufficient to support a jury finding of gross negligence if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 595 (Tex.1999); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994). "Some evidence of simple negligence is not evidence of gross negligence; conversely, some evidence of care does not defeat a gross negligence finding." *Sanchez*, 997 S.W.2d at 595. However, circumstantial evidence alone is sufficient to prove gross

negligence. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998); *Moriel*, 879 S.W.2d at 23. Because Brown & Root challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof at trial, Brown & Root must demonstrate that there is no evidence to support the adverse finding. *R & R Contractors v. Torres*, 88 S.W.3d 685, 706 (Tex.App.-Corpus Christi 2002, no pet.). We may only sustain a "no evidence" point when the record discloses one of the following: (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (4) the evidence establishes conclusively the opposite of a vital fact. *See Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

#### Analysis

■ Gross negligence consists of both an objective and subjective element. *Sanchez*, 997 S.W.2d at 595. First, a plaintiff must prove by clear and convincing evidence that, when viewed objectively, an act or omission on the part of the defendant "involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others." TEX. CIV. PRAC. & REM.CODE ANN. §§ 41.001(7)(B)(i), 41.003(a) (Vernon 1997). Second, by the same evidentiary standard, a plaintiff must show that the defendant "had an actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others." TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.001(7)(B)(ii), 41.003(a) (Vernon 1997). Here, Brown & Root challenges only the second of these elements.

## Actual Awareness

Actual awareness has been defined as a defendant's acts or omissions which demonstrate that a defendant with knowledge of a danger nonetheless acted in a manner of careless disregard. *Ellender*, 968 S.W.2d at 921; *Moriel*, 879 S.W.2d at 22. "What lifts ordinary negligence into gross negligence is the mental attitude of the defendant." *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981). It is this mental attitude of reckless indifference that permits a jury to find "that the defendant had 'decided to ignore the rights of others even in light of probable and threatened injury to them.'" *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 573 (Tex. 1985).

The evidence establishes that Brown & Root was aware of the health hazards related to its use of asbestos. Dr. Victor Roggli, a pathologist, testified that, as early as 1955, the link between asbestos exposure and cancer was "essentially confirmed," and that information, studies, and reports detailing this fact were readily available "to anybody who cared to look for them." Other evidence showed that Brown & Root had been a member of the National Safety Council ("NSC") and that, as a member, it received a publication entitled "National Safety News" which contained articles in 1935, 1966, and 1967 detailing the dangers of exposure to asbestos dust, including its link to mesothelioma. James Hammond ("Hammond"), a former industrial hygienist for Exxon Corporation ("Exxon"), gave testimony concerning the 1969 Bonsib Report, which outlined some of the hazards of asbestos and what precautionary measures companies should take to protect employees. Hammond stated that this report was made available to members of the NSC. Additionally, the jury heard testimony from Steven Sellers ("Sellers"), an industrial hygienist currently employed by Brown & Root's parent corporation. Sellers testified that in its own industrial hygiene library Brown & Root had materials concerning the dangers of asbestos. Specifically, he noted that one particular journal from Brown & Root's library stated that the link between asbestos and cancer has been known since 1935.

Finally, the jury heard evidence relating to Brown & Root's standard safety procedures while doing contract work for Exxon. These procedures included (1) ensuring that Brown & Root's supervisors were aware "of the hazards that would be associated with [asbestos] and what they needed to do about it," and (2) a requirement that non-contract workers who would be exposed to asbestos as a result of the contracted construction would "also wear the equivalent type of approved respirator wherever our people were wearing respirators." Therefore, we conclude that the evidence was sufficient to support a jury finding that Brown & Root had an actual awareness of the risks involved in their use of asbestos.

## Conscious Indifference

In light of the aforementioned evidence, Brown & Root contends only that the evidence, other than that which relates to the Exxon safety mandates, "merits no discussion" because it was offered by witnesses who were not agents or employees of Brown & Root at the time of the Kelly–Springfield project. As to the Exxon safety standards, Brown & Root argues that these standards are limited only to work Brown & Root did on Exxon job sites and should not be construed as Brown & Root's company requirements, policies, or procedures generally. Brown & Root thus urges that *Sanchez* controls the present case, and supports the argument that the evidence is legally insufficient to support a finding of gross neglect.

In *Sanchez,* the plaintiff bled to death after being pinned to a gate by his General Motors ("G.M.") truck. Due to problems with the transmission, Sanchez had shifted "into what he thought was Park, but what was actually an intermediate, 'perched' position between Park and Reverse...." *Sanchez,* 997 S.W.2d at 587. The gear subsequently slipped from that position into Reverse causing the truck to roll backwards into Sanchez. The jury found G.M. to be grossly negligent and assessed both actual and punitive damages. On appeal, the supreme court held that there was insufficient evidence to support a finding of gross negligence. *Id.* at 598.

In its analysis, the supreme court noted that the evidence did not establish that G.M. acted out of "conscious indifference." *Id.* at 596. The only evidence the plaintiff presented regarding this issue was the testimony of two expert witnesses who stated that G.M.'s conduct was a "conscious decision," and that G.M. "knew that people were getting hurt and they made the decision not to do anything about [the problem]." *Id.* The court found, however, that these two statements carried little weight, especially in light of the contrary evidence offered by G.M. *Id.* At trial, G.M. presented evidence that it was taking steps to eliminate the problem, including patent applications and examples of modified engineering to improve the design of its transmissions and increase their safety, along with evidence indicating the lack of a better alternative. The court concluded that "G.M. can[not] be consciously indifferent solely for failing to adopt a safer design it did not know existed." *Id.* at 597. The evidence, the court thus concluded, was insufficient to "support[ ] the inference that G.M. made a conscious choice to implement a more dangerous design in preference to a known safer one that would have substantially reduced the risk." *Id.*

In contrast, the evidence before us indicates that Brown & Root made a conscious choice to implement more dangerous procedures in preference to known practices that would have substantially reduced the risk. For example, the jury heard from Hammond that Brown & Root was aware of the dangers of asbestos as early as 1947, that it took protective measures at some of its work sites, and yet over twenty years later, it was still not employing safety procedures such as monitoring asbestos levels or providing protective equipment and respirators to workers at the Kelly–Springfield site. Further, in 1958 the State of Texas passed legislation requiring contractors to monitor workers exposed to asbestos in order to prevent overexposure. Brown & Root, however, offered no evidence that it was acting in compliance with these requirements. Additionally, extensive evidence was introduced detailing the stringent safety measures mandated by Exxon on all jobs undertaken for them by Brown & Root. These measures outline both the risks involved in the use of materials such as asbestos, and also instruct as to mandatory precautions to be implemented to reduce such risks. No evidence was offered, however, to show that Brown & Root employed any similar measures at the Kelly–Springfield site. Thus, from this evidence alone the jury could reasonably infer that Brown & Root was aware of the dangers involved in its use of asbestos and chose to protect some, but not all, who were exposed to that risk. *See Ellender,* 968 S.W.2d at 924 ("Evidence that Mobil had a policy of monitoring and protecting its own employees but chose not to do the same for contract workers provides additional facts and circumstances for the jury to infer that Mobil knew the risks ... yet proceeded with conscious indifference"). Though Brown & Root asserts that the Exxon policies applied only to Exxon-contracted jobs, in so doing it overlooks the

fact that the crucial inquiry is what is known by the defendant, and not from whom the defendant obtained that knowledge. *See id.* at 921; *Moriel,* 879 S.W.2d at 23; *Wal-Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993).

Further, while Brown & Root correctly notes that none of the witnesses who testified as to the policies of Brown & Root in 1971 were themselves employees of Brown & Root in 1971, the jury was free to consider that fact in reaching their conclusions, and could legitimately draw reasonable inferences from that testimony. *See Ellender,* 968 S.W.2d at 924–925; *Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 786 (Tex.2001). Thus, the evidence need not show, as Brown & Root contends, a particular example of Brown & Root making a recorded, contemporaneous decision to act with indifference as to this specific job. *Id.* Rather, the evidence need only be such that reasonable inferences of a conscious decision could be made. *Id.* As such, we hold that the evidence in this case is legally sufficient to support a finding that Brown & Root had actual awareness of a risk, proceeded to act with conscious indifference to that risk, and was, therefore, grossly negligent. *See Sanchez,* 997 S.W.2d at 595; *Ellender,* 968 S.W.2d at 923. Consequently, we overrule Brown & Root's second issue.

### CORPORATE LIABILITY

 In its third issue, Brown & Root asserts that, even if the evidence is legally sufficient to support the jury's finding of gross negligence, there is no evidence to show an act or omission by a Brown & Root vice-principal which would support an award of exemplary damages.[8] "A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence." *Ellender,* 968 S.W.2d at 921. However, a corporation can act only through "agents of some character." *Id.* (citation omitted). Thus, a corporation can be held to have committed acts of gross negligence by the actions of a vice-principal. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 389 (Tex.1997). The term "vice-principal" encompasses

> (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business.

*Ellender,* 968 S.W.2d at 922. A corporation is also liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent. *Id.* at 921. As opposed to looking only to a single detail or group of factors, an appellate court, determining whether a corporation itself is grossly negligent, must look to the totality of "the surrounding conditions and circumstances at the time and place the act was committed." *Ellender,* 968 S.W.2d at 922;

---

8. Mrs. Shelton first contends that, by failing to object to the jury charge on the controlling issue, Brown & Root has waived a subsequent "no evidence" argument. However, when issues which constitute only a part of a complete and independent ground are not affirmatively raised, and other issues necessarily referable to that ground are submitted and answered, the omitted elements are deemed found in support of the judgment if no objection is made and they are supported by some evidence. *Ramos v. Frito-Lay, Inc.,* 784 S.W.2d 667, 668 (Tex.1990). Consequently, because the element regarding a vice-principal was only a part of the independent charge of gross negligence by Brown & Root, such a finding is deemed to be inherently present, and hence reviewable on appeal, even in the absence of an objection by Brown & Root. *See id.* at 668–69.

*McPhearson v. Sullivan,* 463 S.W.2d 174, 176 (Tex.1971). "Whether the corporation's acts can be attributed to the corporation itself ... is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages." *Ellender,* 968 S.W.2d at 922. If the totality of the evidence is sufficient to lead to the inference that agents of the corporation were aware of the risk to which workers were being exposed, such an inference is sufficient to support corporate liability. *Id.* at 924.

During trial, Mrs. Shelton offered evidence of Brown & Root's subjective awareness of the hazards of asbestos, including medical reports, state regulations, and company policies, along with evidence which tended to show that Brown & Root failed to act in accordance with this information. Sellers also testified that any corporation who did not take the recommended and necessary measures to provide workers with protection, or at least take steps to mitigate exposure, would be acting in an "improper" manner with an "indifferent" attitude. Considering these facts in conjunction with evidence concerning Brown & Root's contract work for Exxon, who required Brown & Root to abide by its safety manual on each contracted job at the risk of losing that job, a jury could reasonably infer that Brown & Root possessed a subjective knowledge of the dangers posed by asbestos but proceeded with conscious indifference to that danger. *See id.*

Brown & Root urges us to consider the holding in *Louisiana Pacific Corp. v. Andrade,* 19 S.W.3d 245 (Tex.1999). In *Andrade,* an employee who was told that the electricity had been turned off suffered an electrical shock, resulting in permanent injuries, when he touched a metal crane.

The supreme court held that, although the defendant had no corporate policy related to turning off the electricity, the absence of such a policy alone did not support an inference of subjective awareness. *Id.* at 248. Here, in contrast, more than a mere lack of a policy has been raised. Rather, the totality of the evidence, in addition to the lack of any policy, is legally sufficient to support a jury's determination that Brown & Root, which was made aware of the hazards posed by asbestos and the remedies which could be used to lessen those risks, acted with gross negligence by choosing not to employ similar remedies in this instance. *See Ellender,* 968 S.W.2d at 924–25. Because we conclude that the evidence before the jury was legally sufficient to support a finding that Brown & Root was grossly negligent, we need not consider whether evidence existed showing action on the part of a Brown & Root vice-principal. *See Torres,* 88 S.W.3d at 711. Brown & Root's third issue is overruled.

### SETTLEMENT CREDITS

In its fourth issue, Brown & Root argues that it was improperly denied a full, dollar-for-dollar offsetting settlement credit. Proper application of settlement credits is a question of law reviewed by a de novo standard. *See Sugar Land Props., Inc. v. Becnel,* 26 S.W.3d 113, 119 (Tex. App.-Houston [1st Dist.] 2000, no pet.).

The relevant statutory provisions are found in Chapter 33 of the Texas Civil Practice and Remedies Code. Section 33.012 provides as follows:

If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to ...

(1) the sum of the dollar amounts of all settlements;

. . . .

TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997). Section 33.011(1) defines "claimant" and provides, in part, as follows:

In an action in which a party seeks recovery of damages for injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of damages pursuant to the provisions of Section 33.001.

TEX. CIV. PRAC. & REM.CODE § 33.011(1) (Vernon 1997).

The Texas Supreme Court has outlined a three-step process for the application of Chapter 33. *See Utts v. Short,* 81 S.W.3d 822, 829 (Tex.2002); *see also Ellender,* 968 S.W.2d at 927–28. First, a defendant seeking credit must file a written election to do so prior to the submission of the case to the jury. *Utts,* 81 S.W.3d at 829. Second, the defendant seeking credit must demonstrate to the trial court that the plaintiff against whom credit is sought benefitted from any settlement. *Id.* If such evidence is presented, "the trial court shall presume the settlement credit applies unless the nonsettling plaintiff presents evidence to overcome this presumption." *Id.; see also Ellender,* 968 S.W.2d at 927–28. Here, Brown & Root's timely filing of the necessary election is not contested. The issue thus turns on whether Mrs. Shelton benefitted from the fourteen settlements.

### Availability of Full Credit

■ In *Drilex Sys., Inc. v. Flores,* the court held that the term "claimant" in section 33.012(b)(1) includes all of the family members whose claim arises from an injury to only one member. *Drilex Sys., Inc. v. Flores,* 1 S.W.3d 112, 122 (Tex. 1999). Thus, Brown & Root contends, Mrs. Shelton and her husband should be considered as one claimant regardless of any allocation between the two made in the settlement agreements. *See, e.g., id.* at 122; *but see Utts,* 81 S.W.3d at 830 (criticizing *Drilex* ). Mrs. Shelton, however, argues that *Drilex* is not controlling because she was pursuing only her individual claims against Brown & Root and Mr. Shelton, after his death, was no longer a party to the action.

*Drilex* involved a husband and father who had been injured and his wife and children who joined as plaintiffs suing two different defendants. All plaintiffs settled with one defendant and in the trial against the remaining defendant, each plaintiff was awarded some amount by the jury. In determining how to apply the settlement credit, the supreme court rejected the argument that settlements paid to one member of a family should not be deducted from the jury award given to another member of that family. *Drilex,* 1 S.W.3d at 122.

As a basis for its holding in *Drilex,* the supreme court cited with approval the case of *J.D. Abrams, Inc. v. McIver,* 966 S.W.2d 87 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). In *McIver,* the plaintiff, Lori Crane ("Crane"), suffered injury, and her mother joined suit both in her individual capacity and as the guardian of her daughter's estate. Before the commencement of trial, several of the defendants settled for a total of $2,497,175. At the close of trial, the jury awarded Crane $13,500,000 without any damage issue having been submitted to the jury as to her mother's individual claim. The trial court gave the defendant credit only for that aggregate amount of the settlements that had been given to Crane. On appeal, the court held that the nonsettling defendant was entitled to a full credit for the total

amount of all settlements, including the settlement amounts that had been designated as compensation only to Crane's mother in her individual capacity. In so doing, the court of appeals, rejecting an argument similar to that made by Mrs. Shelton, stated as follows:

> Crane also contends that this result would make her give a credit for money she never received, money that by court order went to another person, [Crane's mother], for [Crane's mother's] own losses. While that is true, we believe the legislature intended this result in order to protect defendants from plaintiffs who would manipulate settlements among those "seek[ing] recovery of damages for injury to another person."

*Id.* at 97.

Based on this reasoning, the court determined that in *Drilex,* the defendant was entitled to total credit for a settlement entered into by the familial co-plaintiffs against another defendant, even when by its terms the settlement allocated individual payments to the individual claimants. *Drilex,* 1 S.W.3d at 122. Therefore, the total settlement amount should have been deducted from the total jury award to the family. *Id.*

The same issue has recently been revisited by the supreme court in *Utts,* a medical malpractice case brought by a decedent's estate representative and the decedent's surviving spouse and children against both a physician and a hospital. Prior to trial, the decedent's daughter settled with the hospital and distributed the money she received among other family members. She then nonsuited the doctor. The remaining family members settled with the hospital, in agreements totaling $200,000, and continued with a suit against the physician only. The jury rendered a verdict that assigned fault both to the physician and the hospital, and the doctor sought credit for the entirety of the $200,000 settlement into which each member of the family had individually entered with the hospital. The trial court denied the settlement credit, and the court of appeals affirmed. The supreme court reversed, holding that any benefit received by nonsettling plaintiffs from a co-plaintiff's settlement agreement would entitle the nonsettling defendant to a credit. *Utts,* 81 S.W.3d at 829.

Contrary to Mrs. Shelton's contentions, *Utts* did not explicitly overrule, nor substantially modify, *Drilex.* As noted by the court in *Utts,* "a majority of the Court concludes that *Drilex's* Chapter 33 settlement-credit analysis does not control the settlement-credit issue in this case." *Id.* at 830 (Baker, J., concurring). Further, while in their opinions four members of the supreme court assert that *Drilex* was wrongly decided, Justice Owen writes in dissent that "[t]here is at least a consensus of a majority of the Court on one point: *Drilex Systems, Inc. v. Flores* remains good law when family members settle but remain parties pursuing claims against a non-settling defendant." *Id.* at 838 (Owen, J., dissenting). Thus, though some members of the court disagree with *Drilex,* it has not been overruled. *Id.* Therefore, the resolution of Brown & Root's fourth issue turns on whether *Utts* or *Drilex* is controlling.

The facts of the present case are much more analogous to those of *Drilex* than *Utts.* Given the judicially placed limitations on the holding in *Utts, Drilex* remains controlling where the issue is settlement credits allocated to the injured party against recovery by a single derivative family claimant. Further, in the case at bar, Mr.Shelton was the injured party and Mrs. Shelton sought to recover damages. These facts present the exact situation that section 33.011(1) was designed to address as indicated by the Legislature's

chosen language that a "claimant" includes both "that other person and the party seeking recovery of damages." Tex. Civ. Prac. & Rem.Code § 33.011(1); *see Drilex*, 1 S.W.3d at 122 (holding that the Legislature's language in this statute was chosen specifically to effect the treatment of "both that other person and the party seeking recovery of damages" as one claimant). We therefore conclude that *Drilex* is controlling and hold that Mr. and Mrs. Shelton constitute one claimant for the purposes of determining settlement credits. Thus, we sustain Brown & Root's fourth issue and hold that Brown & Root is entitled to a full, dollar-for-dollar credit in the amount of $3,951,900.

In calculating the resulting judgment, Mrs. Shelton argues that any punitive damages are exempt from crediting. In support of this proposition, she cites *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex.2000). We disagree with Mrs. Shelton's reading of the court's opinion in *Casteel.* In *Casteel,* the court held that

> the nonsettling defendant is entitled to offset any liability for joint and several damages by the amount of common damages paid by the settling defendant, but not for any amount of separate or punitive damages paid by the settling defendant.

*Id.* at 391–92. As such, the only restriction as to punitive damages and credits is that a nonsettling defendant's settlement credit will be limited to that portion of a settlement not specifically designated as punitive damages. *Id.* Consequently, because the settlements in question here were divided only as between Mr. and Mrs. Shelton, but not identified as either actual or punitive damages, there is no

*Crown* limitation in this case. Thus, we hold that the judgment amount, both actual and punitive damages, should be reduced by the full credit amount.

### Constitutionality of Full Credit

Mrs. Shelton also argues that the damages awarded by the jury were her separate property. Therefore, she contends that considering her and her husband to be one claimant under section 33.012 would unconstitutionally divest her of her separate property. In support of her contention, Mrs. Shelton argues that a trial court cannot divest a spouse of his or her separate property. *See Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex.1977). We disagree. *Eggemeyer* is not applicable to the present case because its holding is limited to the divisibility of separate property on divorce and the interpretation of certain statutes in the Texas Probate Code. *See id.* at 139–140. To the contrary, we are aware of no Texas law that prohibits a full settlement credit on the facts before us. Therefore, we hold that granting Brown & Root a full settlement credit does not violate Mrs. Shelton's constitutional rights.

### Conclusion

Having sustained Brown & Root's fourth issue, we *modify* the judgment of the trial court to reflect that Brown & Root receives a full settlement credit, in the amount of $3,951,900. The application of the credit to the judgment leaves Brown & Root liable for $64,100 in damages.[9] In all other respects, the judgment of the trial court is ***affirmed.***

---

9. The total amount of the settlement credit was applied first to actual damages. Because the credit exceeds the actual damages, prejudgment interest is not available. *See* Tex.

Civ. Prac. & Rem.Code Ann. § 41.007 (West Supp.2003) ("[p]rejudgment interest may not be assessed or recovered on an award of exemplary damages").