Opinion issued December 30, 2004



     









In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00781-CV




OLYMPIC ARMS, INC., Appellant

V.

PHILLIP R. GREEN, Appellee

***

PHILLIP R. GREEN, Appellant

V.

OLYMPIC ARMS, INC., Appellee




On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 98-45157




O P I N I O N
          In its appeal of this products liability case, appellant, Olympic Arms, Inc.
(“Olympic”), appeals a judgment on a jury verdict in favor of appellee, Phillip Green. 
Green sued Olympic and its co-defendant, Kerry O’Day, for left hand injuries that
Green sustained when a rifle barrel—which Olympic had manufactured and O’Day
had assembled—exploded. On appeal, Olympic contends that the Civil Practice and
Remedies Code required the trial court to submit jury questions that included two
settling parties and the plaintiff, so that the jury could compare Olympic’s causation
with theirs. Olympic further contends that (1) no evidence, or alternatively,
insufficient evidence supports Green’s claims against Olympic; (2) Olympic
conclusively established its substantial alteration defense as a matter of law; (3) the
trial court erred in refusing to instruct the jury as to Olympic’s defensive theories; (4)
the trial court erred in admitting evidence from Green’s experts and in excluding
evidence supporting Olympic’s defensive theories; and (5) the trial court erred in
denying Olympic’s motion for judgment notwithstanding the verdict as to the jury’s
failure to award Olympic its attorney’s fees and expenses. In his appeal, Green
asserts one point of error, in which he contends that the trial court erred in its
calculation of pre-judgment interest. 
          We conclude that the trial court erred in refusing to submit a comparative
causation issue to the jury that included the two settling co-defendants and that the
error is harmful. We further conclude that legally sufficient evidence supports the
jury’s verdict, and Olympic is not entitled to rendition of judgment on Green’s claims. 
We therefore reverse the judgment and remand the case for a new trial.
I. Facts
          In January 1998, Green met O’Day, a gunsmith, at the Houston Safari Show. 
O’Day enjoyed a reputation for making highly accurate, lightweight guns. In March
1998, Green contracted with O’Day to construct a custom .300 Weatherby Magnum
rifle. O’Day ordered the gun barrel for the rifle from Olympic, prepared the barrel
and its other component parts, and assembled the firearm.
          Olympic sells gun barrel blanks to gunsmiths like O’Day, who then incorporate
the Olympic barrels into custom rifles. The gun barrel blank is a steel tube that has
been bored, rifled, and contoured to Olympic’s specifications. A gunsmith consumer
chooses a barrel from the options that Olympic makes available in its catalog. 
Olympic offers six different barrel contours, including an “Ultra Light Contour”—the
one O’Day purchased for Green’s rifle.


 
          In July 1998, Green retrieved the rifle and six boxes of hand-loaded
ammunition from O’Day and test-fired it. Dissatisfied with the accuracy of the rifle,
Green returned it to O’Day, who in turn returned it to Olympic. Olympic replaced the
barrel with another Ultra Light Contour barrel. 
          In August 1998, Green again retrieved the rifle, with the replaced barrel, and
test-fired it. Satisfied with its accuracy, Green took it with him on a Canadian
hunting trip later that month. Upon arrival, he planned to test-fire the rifle to ensure
that its accuracy had not been affected during transit. Green loaded the rifle and
pulled the trigger. The rifle barrel exploded, severing his left thumb and injuring two
fingers on his left hand. 
II. Procedural History
          In addition to suing Olympic and O’Day, Green sued O’Day’s company, Match
Grade Arms & Ammunition, Inc. (“Match Grade”); Olympic’s steel supplier, Earle
M. Jorgenson Company (“EMJ”); and EMJ’s supplier, Nortec Specialty Steels
Company, Inc. (“Nortec”). Green alleged claims for design, manufacturing, and
marketing defects; negligence; and breach of warranty against these defendants. On
the day of trial, Green settled with EMJ for $75,000 and Nortec for $10,000 and
proceeded to trial against Olympic, O’Day, and Match Grade. The next day, Olympic
filed an election of settlement credit with the trial court, asking that it receive the sum
of the dollar amounts of the EMJ and Nortec settlements pursuant to section
33.014(1) of the Texas Civil Practice and Remedies Code.
          At the trial court’s charge conference, Olympic objected to the comparative
causation issue that the court submitted to the jury on the basis that:
[T]here is some evidence that [EMJ] had negligence, or had
some negligence that was a proximate cause to the plaintiff’s
injuries; and, therefore, their negligence is properly submitted to
the trier of fact. And also both [EMJ] and [Nortec’s] negligence
is properly submitted to the trier of fact under chapter 33,
section 33.003 of the Texas Civil Practice and Remedies Code,
which requires that the trier of fact shall consider the negligence
of all settling persons.
 
The trial court overruled Olympic’s objection, at which time counsel for Olympic
tendered a comparative causation question that included EMJ and Nortec. The trial
court refused the question and asked the jury to compare only the causation of
Olympic and O’Day.
          The jury found that both Olympic and O’Day had manufactured and marketed
a defective gun barrel, had breached their implied warranties, and that their
negligence proximately caused the rifle barrel to explode. The jury further found that
a design defect attributable to O’Day, but not to Olympic, existed in the barrel. The
jury placed 50% of the causation of Green’s injuries on Olympic and 50% of the
causation on O’Day, and awarded Green $500,000 in damages. After a reduction for
comparative responsibility, and the addition of pre-judgment interest, the trial court
rendered a judgment against Olympic for $275,985, plus post-judgment interest and
court costs.
III. Proportionate Responsibility
          Olympic contends that the trial court erred in refusing to submit the
comparative causation of EMJ and Nortec, the two settling co-defendants, as well as
Green, for proportionate responsibility purposes. In support of its argument, Olympic
relies upon Chapter 33 of the Civil Practice and Remedies Code. The version of
Chapter 33.003 applicable to this case provided:
The trier of fact, as to each cause of action asserted, shall
determine the percentage of responsibility, stated in whole
numbers, for the following persons with respect to each person’s
causing or contributing to cause in any way the harm for which
recovery of damages is sought, whether by negligent act or
omission, by any defective or unreasonably dangerous product, by
other conduct or activity that violates an applicable legal
standard, or by any combination of these:
 
(1) each claimant;

(2) each defendant;

(3) each settling person; and

                    (4) each responsible third party who has been joined under                               Section 33.004.



See Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.02, 2003 Tex. Gen. Laws 847,
855 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (Vernon Supp.
2004-2005)). The trier of fact thus must compare the causation of the claimant and
any settling party in determining the remaining defendants’ proportionate
responsibility for any resulting damages. The version of chapter 33.011 applicable
to this case defined a settling party as follows:
“Settling person” means a person who at the time of submission has paid
or promised to pay money or anything of monetary value to a claimant
at any time in consideration of potential liability pursuant to the
provisions of Section 33.001 with respect to the personal injury,
property damage, death, or other harm for which recovery of damages
is sought.

See Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.05, 2003 Tex. Gen. Laws 847,
856 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 33.011(5) (Vernon
Supp. 2004-2005)). It is undisputed that Green settled with steel suppliers EMJ and
Nortec for $75,000 and $10,000, respectively. EMJ and Nortec were thus settling
parties as contemplated by section 33.011 of the Texas Civil Practice and Remedies
Code. 
          Although the current version of Chapter 33 states that such a submission is a
mandatory one,


 the version in effect at the time of this suit provided: “Nothing in this
section shall require a submission to the jury of a question regarding conduct by any
party absent sufficient evidence to support the submission.” See Act of May 4, 1995,
74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972, repealed by Act of June
2, 2003, 78th Leg., R.S., ch. 204, § 4.10(1), 2003 Tex. Gen. Laws 847, 859. 
Moreover, under the prior statute, we have conditioned the submission of settling
parties on whether legally sufficient evidence supports the settling parties’
responsibility for damages. See J.D. Abrams, Inc. v. McIver, 966 S.W.2d 87, 90 (Tex.
App.—Houston [1st Dist.] 1998, pet. denied) (reviewing trial court’s refusal to
submit jury question on comparative responsibility to determine if legally sufficient
evidence supported its submission). We thus review a trial court’s refusal to submit
a comparative causation issue to the jury by determining whether legally sufficient
evidence supports the submission. Id.; Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex.
1992). 
          Olympic contends that Green’s expert and O’Day both testified—and therefore
presented evidence at trial—that the rifle barrel steel was defective, and the trial court
therefore erred in refusing to submit the responsibility of steel suppliers EMJ and
Nortec to the jury as settling parties for apportionment of comparative responsibility. 
We agree. At trial, it was undisputed that EMJ and Nortec had supplied the steel that
Olympic used to make Green’s barrel blank. Both Green and John Butters, one of
Green’s expert witnesses, testified that the steel was “bad” and “dirty” and did not
meet the requirements of 416 steel, the preferred quality of steel in this application. 
Moreover, Green’s expert metallurgist, Brian McLellan, testified that the steel was
full of inclusions and microcracks and that, had the steel contained fewer inclusions,
the thickness of the barrel would have been sufficient to withstand the pressure
generated by the .300 Weatherby Magnum cartridges. In a deposition that Green
offered at trial, Olympic’s owner, Bob Schuetz, testified that it had relied on its
supplier to provide it with rifle barrel quality steel. Such evidence raises a fact issue
as to the settling steel suppliers’ potential responsibility for the accident.
          Green first responds that the trial court did not err in refusing to submit EMJ’s
and Nortec’s responsibility to the jury to determine apportionment because Olympic
and Green had nonsuited their affirmative claims against EMJ and Nortec before the
trial and, thus, had eliminated any pleadings to support the submission of these
settling parties. See Tex. R. Civ. P. 278 (requiring pleadings and evidence for
submission of questions, instructions, and definitions).


 Green ignores, however,
Olympic’s pleadings against him, which expressly allege that the acts or omissions
of third parties caused Green’s injuries. 
          In particular, Olympic’s third amended answer alleges the following:
Plaintiff’s damages, if any, were caused by the acts or omissions
of others, including, without limitation, Plaintiff, Defendant Kerry
O’Day, Match Grade Arms & Ammunition, Inc., and Earle M.
Jorgensen Company d/b/a Jorgensen Steel & Aluminum.

Thus, Green’s contention that no pleadings exist to support the submission of EMJ
and Nortec because Green and Olympic had nonsuited their claims against these
settling parties is without merit. Cf. Kroger Co. v. Betancourt, 996 S.W.2d 353,
357–58 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). In Betancourt, Kroger
failed to file any pleadings asserting that a settling person was liable and failed to file
a written election of settlement credit pursuant to Section 33.014. Id. The Fourteenth
Court of Appeals determined that “there is no cross-action against Crown and no
written election for settlement credit, so Kroger has no pleading supporting
submission of a comparative responsibility issue.” Id. at 358. Here, in contrast,
Olympic alleged that EMJ and others caused Green’s injuries, and Olympic timely
had filed a written election for a settlement credit. We thus hold that Olympic
satisfied the pleading requirements of rule 278 for the submission of settling
defendants.
          Second, Green contends that no evidence exists that EMJ was responsible in
part for Green’s damages because no evidence exists that the steel was defective. 
Green’s contention, however, is inconsistent with the evidence he presented at trial
supporting his manufacturing and marketing defect claims. At trial, as set forth in our
legal sufficiency analysis, infra, Green presented witnesses who testified that the steel
was not of adequate quality, that it was “filing cabinet” steel, and that the presence
of too many inclusions in the steel caused the rifle barrel to fail. Green himself also
testified that the composition of the steel was defective and offered Schuetz’s
deposition testimony, which showed that Olympic had relied on EMJ to provide it
with rifle barrel quality steel. Thus, the evidence that supports Green’s claims against
Olympic also supports a causation issue to include Olympic’s steel suppliers.
          Third, Green contends that Schuetz’s answer to a cross-examination
question—that he had no “problems with the quality of steel” that EMJ had provided
to Olympic—constitutes a binding judicial admission that Olympic had no claims
against EMJ or Nortec.


 Green relies upon a summary judgment case, in which the
Texas Supreme Court defined a judicial admission as “[a]ssertions of fact, not plead
in the alternative, in the live pleadings of a party.” Holy Cross Church of Christ in
God v. Wolf, 44 S.W.3d 562, 568 (Tex. 2001). The Texas Supreme Court held that
“[a] judicial admission that is clear and unequivocal has conclusive effect and bars
the admitting party from later disputing the admitted fact.” Id. In Wolf, the court
determined that the assertions of fact in Wolf’s live pleadings that were not pled in
the alternative, together with his affirmative agreement in his appellate brief as to the
admitted fact, constituted a binding judicial admission for summary judgment
purposes. See id. 
          Here, Schuetz’s affirmative answer to Green’s question on cross-examination
does not constitute a binding judicial admission because it is “an assertion of fact”
that was not conclusively established in Olympic’s live pleadings. See Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 905 (Tex. 2000) (holding that a judicial
admission occurs when assertion of fact is conclusively established in live pleadings,
making introduction of other pleadings or evidence unnecessary). Rather, the content
and the quality of the steel were contested issues at trial, and Schuetz testified
elsewhere that he had depended on his suppliers for quality control of the steel.
          Olympic took the position at trial that the steel was not defective, and Green
and O’Day both took the position that the steel was defective. If the jury disagreed
with Olympic and agreed with Green and O’Day, then Olympic was entitled to have
the jury examine and compare responsibility between it and the settling defendants
for the faulty steel. See Tex. Civ. Prac. & Rem. Code Ann. § 3.011. The jury had
evidence from which it could conclude, and from which Olympic could frame a
closing argument, that part of the responsibility for Green’s injuries rested with the
steel suppliers. We hold that legally sufficient evidence exists to support the
submission of a comparative causation issue. Thus, the trial court erred in not
submitting the issue of EMJ and Nortec’s proportionate responsibility. See Act of
June 2, 2003, 78th Leg., R.S., ch. 204, § 4.05, 2003 Tex. Gen. Laws 847, 856 (current
version at Tex. Civ. Prac. & Rem. Code Ann. § 33.011(5) (Vernon Supp. 2004-2005)). 
          With regard to Olympic’s complaint that Green’s name also should have been
submitted to the jury, the record indicates that neither Olympic, O’Day, nor Green
offered evidence sufficient to raise an issue as to Green’s comparative fault for the
accident. Moreover, Olympic provides neither argument nor record citations to
support its assertion that Green caused the barrel explosion. See Tex. R. App. P.
38.1(h). Accordingly, we hold that the trial court did not err in refusing to submit
Green’s responsibility for comparative causation purposes.
          A reversal is warranted if the trial court denies a proper submission of a valid
theory of recovery raised by the pleadings and the evidence, and the error probably
caused the rendition of an improper judgment. Tex. R. App. P. 44.1; see Lone Star
Gas Co. v. Lemond, 897 S.W.2d 755, 756–57 (Tex. 1995); Exxon Corp. v. Perez, 842
S.W.2d 629, 631 (Tex. 1992). We must therefore determine whether the error
probably caused the rendition of an improper judgment.
          A liable defendant is generally responsible only for the percentage of damages
found by the trier of fact equal to that defendant’s percentage of responsibility with
respect to those damages. See Act of May 18, 1995, 74th Leg., R.S., ch. 136, §
33.013, 1995 Tex. Gen. Laws 971, 974 (current version at Tex. Civ. Prac. & Rem.
Code Ann. § 33.013 (Vernon Supp. 2004-2005)). Here, the jury attributed 50% of
the cause of Green’s injuries to Olympic and 50% to O’Day. Had it properly been
instructed, the jury could have attributed part of the causation placed on Olympic to
EMJ, to Nortec, or to both. The jury heard legally sufficient evidence that the settling
parties’ product could have contributed to the cause of Green’s injuries; thus, we
cannot conclude that the trial court’s failure to submit EMJ’s and Nortec’s
responsibility was harmless error. See Tex. R. Civ. P. 44.1. 
          We hold that the trial court’s error in failing to submit the settling co-defendants’ responsibility warrants reversal. We now turn to Olympic’s legal
sufficiency complaints to evaluate whether we should render judgment or, instead,
remand the cause for a new trial based upon the charge error.



IV. Legal Sufficiency of the Evidence–Green’s Claims
          Olympic contends that the trial court erred in denying its motion for judgment
notwithstanding the verdict on Green’s products liability, breach of warranty, and
negligence claims. We review the denial of a motion for judgment notwithstanding
the verdict as a challenge to the legal sufficiency of the evidence. See Moore v. Bank
Midwest, N.A., 39 S.W.3d 395, 400 (Tex. App.—Houston [1st Dist.] 2001, pet.
denied). We consider all of the evidence in the light most favorable to the non-movant and disregard all evidence to the contrary. Russell v. City of Bryan, 919
S.W.2d 698, 705 (Tex. App.—Houston [14th Dist.] 1996, writ denied). We resolve
all reasonable inferences in favor of the non-movant. Id. We reverse and render only
if no evidence—or less than a scintilla of evidence—exists to support the judgment. 
See Scott v. Pointdexter, 53 S.W.3d 28, 32 (Tex. App.—San Antonio 2001, pet.
denied).
A.      Manufacturing Defect
          Olympic contends that the trial court erred in denying its motion for judgment
notwithstanding the verdict on its manufacturing defect cause of action because no
evidence supports the jury’s verdict that the barrel blank Olympic manufactured
contained a manufacturing defect. Green responds that the jury’s verdict is based
upon evidence that Olympic, in making its Ultra Light Contour rifle barrels, used
steel that was not strong enough to withstand the pressure for its intended use.
          To recover in strict liability for a manufacturing defect, Green must
demonstrate that the rifle barrel was defective when it left Olympic’s hands and that
the defect was a producing cause of his injuries. See Torrington Co. v. Stutzman, 46
S.W.3d 829, 844 (Tex. 2000). “A product has a manufacturing defect if its
construction or quality deviates from the specifications or planned output in a way
that is unreasonably dangerous.” Id.
          Green testified, without objection, that he brought the rifle to Engineering and
Fire Investigations (“EFI”) to be analyzed and that, when he retrieved his rifle, an EFI
employee informed him that the “gun barrel was full of inclusions and this thing
should have never been used on a rifle barrel.”


 John Butters, a registered
professional engineer, testified that “the only reason that this barrel failed was
because it was improperly manufactured steel.” Butters further testified that the
amount of pressure that it takes to split a pressure vessel “is out of the first book of
machine design that an engineer ever gets” and that Green’s rifle was “just a pressure
vessel.” Butters was “absolutely confident” that the barrel’s thickness was sufficient
to support the amount of pressure generated by firing Green’s rifle. 
          Olympic cross-examined O’Day, eliciting testimony that, if Green’s barrel had
been made of “quality 416 steel, without the inclusions, [then] it would have been
fine.” Rex McClellan, a Rice University metallurgist, testified that the steel in the
Olympic barrel was “full of inclusions” and “microcracks,” which became larger
each time the rifle was fired. As the microcracks grew over time, they effectively
decreased the wall thickness of the barrel, until the barrel’s thickness reached a
“critical size” and failed. McClellan testified that the rifle barrel’s lack of thickness
mattered because “too many inclusions” existed in the steel. Had the steel that
composed the barrel not contained such extensive inclusions, the thickness of the
barrel would have been sufficient. 
          Olympic contends that Green failed to demonstrate the existence of any
evidence that the Olympic barrel deviated in any way from planned output and that
this failure entitles Olympic to judgment as a matter of law. See Am. Tobacco Co. v. 
Grinnell, 951 S.W.2d 420, 434 (Tex. 1997) (stating that manufacturing defect is
deviation from planned output which renders product unreasonably dangerous). In
Grinnell, the plaintiffs contended that American manufactured defective cigarettes
because they contained pesticide residue. Id. at 433. American contended that the
Grinnells’ manufacturing defect claim based on the presence of pesticide residue was
a design defect claim disguised as a manufacturing defect claim because all cigarettes
contain such a residue from tobacco fumigation. Id. The Texas Supreme Court
rejected this argument, concluding that “[a]lthough pesticide residue may be found
in many, if not all cigarettes, it is not an ingredient American intended to incorporate
into its cigarettes.” Id. The court concluded that the presence of pesticide residue
therefore could be a manufacturing defect. Id. 
          Here, the record contains evidence that Olympic intended some inclusions to
be present in the steel because the inclusions served a purpose. John Slater,
Olympic’s expert, explained that manufacturers deliberately add sulfur to stainless
steel during the formation process to make the steel easier to machine. Without the
addition of sulfur, stainless steel can be “extremely difficult” to machine, and the
inclusions allow the steel to become “easily machinable.” In asking for judgment
notwithstanding the verdict, however, Olympic ignored McClelland’s testimony
regarding the correlation between the amount of sulfur and the resulting number of
inclusions and the evidence suggesting that Olympic’s barrel failed due to the
presence of too many inclusions. Moreover, O’Day testified that he had witnessed
another Olympic barrel fail shortly after Green’s. O’Day sold that barrel around the
time that he built Green’s rifle. O’Day had that barrel tested, and the results of the
analysis revealed that the steel in that barrel was also “full of inclusions,” causing the
barrel to split. 
          Paul Stevens, the individual responsible for quality control at Olympic, testified
that he inspects less than five percent of the barrel blanks that Olympic ships to
dealers. Stevens testified that he could not determine whether the barrel blank that
Olympic had shipped to O’Day for Green’s rifle had ever been tested or inspected. 
Olympic did not perform tests to determine whether inclusions existed on the interior
surface of its barrel blanks. In the event that an Olympic barrel suffered a
catastrophic failure and was returned to Olympic for a refund, Stevens testified that
he would not be notified. McLellan testified that if he were providing Ultra Light
Contour barrels to gunsmiths whom he knew were chambering the barrels for
Weatherby Magnum cartridges, he would implement an “extensive testing program,”
and he criticized Olympic’s practice of not maintaining records of its test results on
its steel beyond one year. 
          Viewed in a light favorable to the jury’s verdict, the evidence indicates that the
rifle barrel was defective because it contained too many inclusions, the inclusions
contributed in part to the rifle barrel’s failure, and the inclusions were a producing
cause of Green’s injuries. The record thus contains legally sufficient evidence to
support the jury’s manufacturing defect finding. See Grinnell, 951 S.W.2d at 434.
B.      Marketing Defect
          Olympic contends that the trial court erred in denying its motion for judgment
notwithstanding the verdict on Green’s marketing defect claim because no evidence
supports the jury’s conclusion that Olympic marketed the rifle barrel blank in a
defective manner. 
          In order to recover for a marketing defect, a plaintiff must establish that (1) a
risk of harm is inherent in the product or may arise from the intended or reasonably
anticipated use of the product; (2) the product supplier actually knows or reasonably
foresees the risk of harm at the time the product is marketed; (3) the product
possesses a marketing defect; (4) the absence of the warning or instructions renders
the product unreasonably dangerous to the ultimate user or consumer of the product;
and (5) the failure to warn causes the product user’s injury. Jaimes v. Fiesta Mart,
Inc., 21 S.W.3d 301, 305–06 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). 
Olympic contends that it had no duty to warn an expert gunsmith, like O’Day, that its
.30 caliber barrel blank should not be chambered for .300 Weatherby Magnum
cartridges, i.e., there is no evidence that the absence of a warning made the product
unreasonably dangerous to a user like O’Day. Olympic also contends that it is
entitled to judgment as a matter of law because there is no evidence that O’Day would
have heeded such a warning, i.e., there is no evidence that the failure to warn caused
Green’s injury.
          Causation and Warning
          Olympic contends that Green’s marketing defect claim fails because no
evidence exists to prove a causal nexus between Olympic’s failure to warn of the risk
of rifle barrel failure and Green’s injury. Olympic’s rifle barrel arrived to O’Day
packaged in a cardboard box and accompanied by an invoice. Olympic’s counsel
asked O’Day whether he had ever read the back side of the invoice, and O’Day
replied, “I don’t pay much attention to it.” Based on this testimony, Olympic
contends that O’Day did not read its invoice and thus would not have heeded any
warning. Olympic further contends that O’Day presently is aware that chambering
an Ultra Light Contoured barrel blank for .300 Weatherby Magnum cartridges is
dangerous, but that he continues to do so, using another supplier, and that his
continued practice conclusively negates any causative nexus between Olympic’s
failure to warn and Green’s injury. 
          O’Day contested Olympic’s view at trial. In its brief, Olympic overlooks the
following testimony:
[O’Day’s Counsel]          If [Olympic] would have told you that you couldn’t put a
magnum chamber on an ultra light taper would you have
placed orders for that material?
 
[O’Day]                           No, sir. I would have either found another supplier that
would have said it was okay, or I wouldn’t have produced
them.

O’Day also testified that, before he began ordering Ultra Light Contour barrels, he
contacted Olympic, informed it that he would be working with magnum calibers, and
“asked if there was any problem in putting them on ultra light tapers.” O’Day
contends that Olympic informed him that there would be “no problem” with his
proposed use of its barrels. O’Day pointed out to the jury that he returned Green’s
first rifle barrel to Olympic to replace it when it did not fire accurately and that
Olympic did not question its length or its use with a magnum cartridge—it simply
sent O’Day a replacement barrel. Thus, the parties hotly contested this issue at trial. 
The jury, as the finder of fact, had the opportunity to view the witnesses and to weigh
their credibility. See Eberle v. Adams, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st
Dist.] 2001, pet. denied). 
          We conclude that the record contains more than a scintilla of evidence, and
thus legally sufficient evidence, to support the jury’s determination with regard to a
causal nexus and thus to support its determination on this element of marketing
defect. Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996)
(holding that anything more than scintilla of evidence is legally sufficient to support
finding). 
          Common Knowledge Defense
          Olympic also contends that it is entitled to judgment as a matter of law on
Green’s marketing defect claim because it had no duty to warn O’Day, an “expert
user,” of dangerous uses associated with its product; hence, no evidence exists that
the failure to warn made the gun barrel unreasonably dangerous, as required to prove
a marketing defect. See Sauder Custom Fabrication, Inc. v. Boyd, 967 S.W.2d 349,
351 (Tex. 1998); Grinnell, 951 S.W.2d at 426. In Grinnell, the Texas Supreme Court
observed that common knowledge “encompasses only those things so patently
obvious and so well known to the community generally, that there can be no question
or dispute concerning their existence.” Grinnell, 951 S.W.2d at 426; see also Joseph
E. Seagram & Sons, Inc. v. McGuire, 814 S.W.2d 385, 388 (Tex. 1991).  
          Olympic contends that no ordinary person trained to perform custom gunsmith
work could have failed to appreciate the risk of barrel failure in (1) chambering an
Ultra Light Contour barrel blank for a .300 Weatherby Magnum cartridge and (2)
shortening the barrel taper to a fractional point less than a published industry
standard. Olympic notes that O’Day’s modifications to the Olympic barrel required
extensive experience and expensive equipment, such as a reamer, a lathe, and a
machine cutter. Wayne Barnett, an expert gunsmith, testified that he thought Olympic
should not have had to warn O’Day not to install a .300 Weatherby Magnum chamber
in a barrel with the wall thickness of the Olympic Ultra Light barrel and that “a
custom gunsmith that has the experience of chambering and putting together custom-made rifles should know what wall thickness they should use and order accordingly.” 
Barnett testified that he would not have relied on Olympic’s representation, or any
other manufacturer’s representations regarding suitability when ordering a rifle barrel
blank. O’Day, however, testified that he had told Olympic of his intended use for the
barrel that it sold to him and, if Olympic had informed him that his proposed use of
its barrel blanks was dangerous, he would have either found another supplier or not
made an Ultra Light rifle chambered to fire a .300 Weatherby Magnum cartridge.
          A manufacturer owes no duty to warn a consumer of the “obvious risks”
associated with a product. See Grinnell, 951 S.W.2d at 426; see also Caterpillar v.
Shears, 911 S.W.2d 379, 382 (1995). Olympic relies upon the obvious-risk line of
cases to support its argument that it had no duty to warn O’Day and, therefore, had
no duty to Green. The cited cases, however, involve obvious risks apparent to the
average user. In Martinez v. Dixie Carriers, Inc., 529 F.2d 457, 464 (5th Cir. 1976),
for example, the Fifth Circuit Court of Appeals determined that the injured plaintiff
was actually aware of the nature of the dangers associated with that product.


 
Likewise, in Boyd, 967 S.W.2d at 351, the Texas Supreme Court concluded that the
obviousness of a risk must be determined from the perspective of an average person
or an “average user” of a product. Here, there is no evidence from which to conclude,
as a matter of law, that an expert gunsmith, let alone an average person, would have
recognized that Olympic’s Ultra Light Contour rifle barrel blank was suitable for
some types of rifle cartridges. Rather, Olympic’s expert conceded that he knew that
gun assemblers similar to O’Day shortened the throats in gun barrels in order to make
a more accurate rifle. Moreover, he agreed that Olympic’s barrel requires a gunsmith
to machine it and to shorten it to a degree within a fractional inch of the amount to
which O’Day shortened it. O’Day testified that he, as an ordinary user of Olympic’s
barrel, was unaware of the danger presented by its product. O’Day further testified
that he expected Olympic to have the expertise and knowledge to determine what
kind of steel should be used in its .30 caliber Ultra Light Contour barrel blanks. 
          In some instances, a manufacturer or supplier may depend on an intermediary
to communicate a warning to the ultimate user of a product. Firestone Tire & Rubber
Co. v. Battle, 745 S.W.2d 909, 914 (Tex. App.—Houston [1st Dist.] 1988, writ
denied). A manufacturer is not, however, relieved of its duty to warn those whom it
reasonably should expect to be endangered by the use of its product solely due to the
presence of an intermediary. Id. The parties presented conflicting evidence on the
adequacy of O’Day’s expertise so as to relieve Olympic of its duty to warn. We
therefore hold that Olympic did not establish its “common knowledge” defense as to
O’Day as a matter of law and that more than a scintilla of evidence exists to support
the jury’s determination on marketing defect. Olympic therefore is not entitled to
rendition of judgment on this cause of action.
C.      Breach of Warranty
          Olympic contends that no evidence supports the jury’s verdict on Green’s
warranty claims. The jury found that Olympic breached its implied warranties of
fitness for a particular purpose.


 
          Olympic contends that Green’s claim for breach of the implied warranty of
fitness for a particular purpose fails because (1) the record contains no evidence that
Olympic had reason to know of any particular purpose for which its goods were
required, beyond the ordinary purpose for which its rifle blanks are sold, and (2) no
evidence exists that Olympic had reason to know that O’Day relied upon Olympic’s
skill or judgment in selecting suitable goods. Olympic relies on Comment two to
section 2.315 of the Texas Business and Commerce Code.


 Section 2.315 defines
an implied warranty of fitness for a particular purpose as: 
Where the seller at the time of contracting has reason to know any
particular purpose for which the goods are required and that the
buyer is relying on the seller’s skill or judgment to select or
furnish suitable goods, there is unless excluded or modified under
the next section an implied warranty that the goods shall be fit for
such purpose.

Tex. Bus. & Com. Code Ann. § 2.315 (Vernon 1994).
          Olympic contends that O’Day furnished “technical specifications” for the rifle
barrel—specifically, he ordered a broach cut .30 caliber National Match barrel blank
with a 1-in-10 rifle twist and ultra light tapers—thereby precluding the application
of any implied warranty of fitness for a particular purpose. It does not follow from
the comment to section 2.315 of the Texas Uniform Commercial Code, however, that
no warranty of fitness for a particular purpose exists if a plaintiff has ordered
according to specifications; rather, in such circumstances, comment two notes that a
warranty of fitness may not be the dominant warranty, given other inconsistent
warranties. 
          Here, Green does not contend that Olympic’s barrel blank failed to conform to
O’Day’s technical specifications, which did not extend to the type of steel to be used. 
Instead, Green contends that Olympic used defective steel for the rifle barrel it
sold—steel with too many inclusions and microcracks for an Ultra Light Contour
barrel—making the gun unfit for the particular purpose for which it was designed. 
Olympic chose the steel that it used to make the rifle barrel. Schuetz testified that “I
myself personally order all the barrel steel that we need, because I watch this very
closely.” He fills out purchase orders that specify the diameter and grade of the steel
and that it should be “rifle barrel quality.” 
          Olympic sells its custom rifle barrels to gunsmiths through a catalog. Schuetz
testified that the catalog “explains the custom barrels that we make for the sale to the
gunsmiths and explains what material is there, what the twists are and what material
we use, what the contours are.” O’Day ordered Green’s rifle barrel according to
specifications set forth in Olympic’s catalog. The record also contains evidence that
Olympic knew that O’Day intended to use its barrel blanks in magnum calibers and
that Olympic informed O’Day that putting them on its ultra light tapers presented no
problems.


 
          The fact that O’Day contacted Olympic and Olympic informed him that there
would be no problem with the proposed use of Olympic’s barrel blanks supports the
jury’s finding that Olympic had knowledge of the fact that O’Day relied on its
representations. See Tex. Bus. & Com. Code Ann. § 2.315 (providing that, if seller
at time of contracting has reason to know (1) of particular purpose for which goods
required and (2) that buyer is relying upon seller’s skill and judgment to furnish
suitable goods, law implies warranty that goods shall be fit for such purpose, unless
warranty properly excluded).
          Moreover, the first comment of Section 2.315 provides:
Whether or not this warranty arises in any individual case is basically a
question of fact to be determined by the circumstances of the
contracting. Under this section the buyer need not bring home to the
seller actual knowledge of the particular purpose for which the goods
are intended or of his reliance on the seller’s skill and judgment, if the
circumstances are such that the seller has reason to realize the purpose
intended or that the reliance exists. The buyer, of course, must actually
be relying on the seller.
Tex. Bus. & Com. Code Ann. § 2.315 cmt. 1. 
          The evidence presented at trial raises a fact issue as to whether Olympic
breached its implied warranty, and the trial court correctly submitted a question to the
jury on this issue. We conclude that legally sufficient evidence exists to support the
jury’s finding. Olympic therefore has not established that it is entitled to rendition
of judgment on O’Day’s cause of action for breach of the implied warranty of fitness.
D.      Negligence
          Olympic contends that Green’s negligence action is barred as a matter of law
because no evidence supports Green’s manufacturing and marketing defect claims. 
For example, if no duty to warn exists, a similarly framed negligence action is barred
as a matter of law. See McGuire, 814 S.W.2d at 387–88 (holding that no duty to warn
of open and obvious danger of alcoholism from continuous consumption of alcoholic
beverages also bars negligence claim). Olympic raises no other argument on appeal
with regard to the jury’s finding on Green’s negligence claim. We have already
determined that legally sufficient evidence exists to support Green’s manufacturing
and marketing defect claims; therefore, Olympic’s dependent contention that Green’s
negligence claim fails as a matter of law is without merit.
V. The Admissibility of Expert Testimony
          Several of Olympic’s legal sufficiency points include complaints as to the
admissibility of expert testimony. Olympic contends that the evidence supporting
O’Day’s causes of action is legally insufficient without this improperly admitted
testimony. We thus address Olympic’s complaints about Green’s experts, to the
extent they relate to its legal sufficiency complaints. 
          Olympic contends that the trial court abused its discretion in permitting Rex
McLellan, John Butters, and Kerry O’Day to testify at trial regarding metallurgical
issues (McLellan) and causation (Butters and O’Day).


 McLellan opined that
Olympic’s steel was inappropriate for high pressure rifle applications. Butters
testified that Olympic manufactured its rifle barrel from “dirty” and defective steel
that could not withstand the pressure generated inside the rifle barrel. O’Day also
testified that the Olympic rifle barrel was composed of defective steel and it was the
defective steel, not his work on the barrel, that caused the barrel to fail. 
A. Standard of Review
          We review the trial court’s decision to admit expert testimony for abuse of
discretion. E.I. du Pont de Nemours & Co., Inc. v. Robinson, 923 S.W.2d 549, 558
(Tex. 1995). This court will overturn a trial court’s decision to admit such evidence
upon a finding that the trial court’s ruling is arbitrary, unreasonable, or without
reference to any guiding rules or legal principles. K-Mart Corp. v. Honeycutt, 24
S.W.3d 357, 360 (Tex. 2000) In determining whether to admit particular expert
opinions, trial courts “must ensure that those who purport to be experts truly have
expertise concerning the actual subject about which they are offering an opinion.”
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998). 
Moreover, a trial court must evaluate the methods, analysis, and principles upon
which an expert relies in reaching an opinion, to ensure that the opinion given
comports with applicable professional standards outside the courtroom and that it has
a reliable basis in the knowledge and experience of the discipline. Tex. R. Evid. 702;
Gammill, 972 S.W.2d at 725–26. 
          In a complaint regarding the reliability of expert testimony, a party must
present it to the trial court, or appellate review is waived. See Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998). No objection is required, however,
to preserve a no-evidence challenge to conclusory expert testimony. Coastal
Transport Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004)
(holding that objection is required if challenging underlying methodology, technique,
or foundational data supporting expert testimony, unless testimony is wholly
speculative or conclusive).
B. Brian McLellan
          Olympic contends that McLellan’s causation opinions are unreliable. In its
brief, however, Olympic acknowledges that it does not impugn McLellan’s
“metallurgical expertise.” Olympic instead contends that McLellan is not qualified
to give expert testimony on “gunsmithing issues.”
          McLellan holds a Ph.D. in metallurgy and is a Professor of Material Science
at Rice University. He performs failure analyses on metals. McLellan has taught and
reviewed industrial failures in metals for 35 years and has accrued “long experience
close up in looking at defects in metallic components and figuring out what caused
them and how you can possibly avoid them.” McLellan testified that literature in his
field observes that manganese and sulfide inclusions in too great an amount
contribute to shotgun barrel explosions. If a high number of inclusions are present
in a gun barrel, and the metal is subjected to high stresses, the inclusions will grow
until one reaches a critical size and causes the rifle barrel to fail. 
          McLellan performed tests on Green’s barrel and opined that the barrel failed
because of the interaction of three variables. First, Olympic intentionally made the
“raw thickness” of the rifle barrel relatively small to reduce its weight. Second,
O’Day used a cartridge for the rifle barrel that creates high pressure when fired. 
Third, the Olympic barrel steel was full of inclusions and microcracks, which became
larger each time the rifle was fired, until the largest crack caused the barrel to
disintegrate. The inclusions present in Olympic’s steel barrel were a problem because
Olympic used thin walls in constructing its barrel. McClellan testified that, had the
Ultra Light Contour barrel contained no inclusions, “calculations show you that even
for this powerful round, this wall thickness would amply take care of it.” 
          Olympic contends on appeal that McLellan’s metallurgical opinions were
“conclusively gutted” because at trial, he retracted the “mistaken impression” in his
initial expert report that the steel contained too much sulfur. McLellan’s error arose
because of a misprint in the American Society of Metals handbook. McLellan
acknowledged his error at trial, agreeing that the Olympic barrel did not contain 10
times the amount of sulfur that 416 steel should contain. He noted, however, that “the
point of mentioning the high sulfur content in my report is because that is what
ultimately caused the problem with the rifle, not the misprint in the ASM book.” 
Olympic’s counsel also challenged McLellan’s conclusion that the barrel “may not
be 416 steel because of a discrepancy in the manganese content” by demonstrating
that 416 steel has a maximum manganese content of 1.25, and that “if the subject
barrel had manganese of 0.49, that’s within . . . the maximum noted of 1.25.” 
McLellan acknowledged this statement as correct. McLellan persisted in his opinion,
however, that, based on his tests, the barrel’s high number of inclusions ultimately
caused the rifle to fail. Olympic did not dispute that the rifle barrel contained a
number of inclusions.
          Olympic agrees that McLellan possesses “unimpugned” qualifications to testify
to issues requiring metallurgical expertise, but contends that he lacks qualifications
to testify that “416 steel is inappropriate for high-pressure rifle applications” because
this opinion pertains to gun design, and McLellan is not qualified to offer opinions
on gun design. McLellan explained, however, that he has considerable experience
through his training in metallurgy “since quality control is an important and intrinsic
part of manufacturing with metals.” McLellan also explained that he has modified
and repaired guns for 35 years, described himself as an “amateur gunsmith,” and
stated that, during that time, he has gained a “good modicum” of knowledge
regarding firearms. Olympic’s metallurgical expert, John Slater, did not contest
McLellan’s qualifications for rendering the opinions he presented. Instead, Slater
replied that “Dr. McLellan has the academic background to do the work that he does.” 
          We conclude that the trial court did not abuse its discretion in determining that
McLellan’s testimony was reliable and therefore admissible. Although Olympic
exposed some weaknesses in his opinions, Robinson provides that the jury is to assess
the weight and credibility of an expert’s proffered testimony. Robinson, 923 S.W.2d
at 558; see also Gammill, 972 S.W.2d at 728 (providing that cross-examination is
“the traditional and appropriate means of attacking shaky but admissible evidence”). 
          Olympic further contends that Green did not timely disclose McLellan’s
testimony that “416 steel is inappropriate for high-pressure rifle applications” and,
therefore, the testimony should have been excluded. McLellan testified that the
opinions contained in his supplemental report were based, in part, on the eve-of-trial
deposition testimony of Schuetz. The trial court asked Green’s counsel to justify the
timing of his expert’s supplemental report. Green’s counsel responded that in
Schuetz’s deposition, taken fewer than four weeks before trial, he identified Paul
Stevens, for the first time, as the individual responsible for quality control at
Olympic. McLellan thus could not supplement his report within the discovery period
because Olympic had not identified Stevens before then. Olympic did not urge the
untimeliness of McLellan’s “new opinion” as a basis for a motion for continuance and
did not seek an additional opportunity to depose McLellan. The trial court overruled
Olympic’s motion to exclude. Given the timing of events, we conclude that the trial
court did not abuse its discretion in overruling Olympic’s motion to exclude
McLellan’s testimony based upon the untimeliness of McLellan’s supplementation. 
See K-Mart Corp., 24 S.W.3d at 360.
C. John Butters
          Butters, a mechanical engineer, testified that he examined Green’s Olympic
barrel and determined that it did not fail because of the presence of an obstruction in
the barrel, and the barrel split nine inches from the chamber. He compared the
cartridges fired in Green’s rifle before the barrel failed to the shape of a cartridge
fired from a properly chambered .300 Weatherby Magnum rifle. He determined that
no defect existed due to the “machining” of the chamber. Butters testified that, if the
chamber had been designed improperly with a “throat” cut too short, then physical
evidence of excessive pressure would be present in the chamber. Butters testified
that, if the gun had exploded due to excessive pressure, the printing on the “case
head” would be smeared, the primer would be flattened, and there could be an
indication that gas had leaked from around the primer. No such signs of excessive
pressure were present in Green’s rifle. Butters testified that the rifle was made with
defective steel, and he was “absolutely confident” that the barrel’s thickness was
sufficient to support the amount of pressure generated after Green fired the cartridge. 
          Olympic concedes that Butters is qualified to testify about engineering issues,
but contends that Butters is not a metallurgist and should not have testified about the
quality of the steel. Butters testified, however, that the barrel did not fail due to
excessive pressure and that the thickness of the barrel was sufficient—opinions based
upon his engineering expertise. We hold that the trial court did not abuse its
discretion in admitting this testimony.
          Olympic correctly points out that Butters should not have testified that the steel
was defective. Green testified without objection, however, that he was informed by
an EFI employee that EFI had tested the Olympic barrel and that the test had revealed
that “this gun barrel was full of inclusions and this thing should have never been used
on a rifle barrel. This is the type of steel that you would find . . . in a file cabinet.” 
O’Day also testified, without objection, that the barrel was made from steel that did
not meet the requirements of 416 steel. Finally, McClellan, whom Olympic concedes
has expertise in the matter, testified that the steel was defective. Olympic thus has not
demonstrated how Butters’s testimony about the steel, even if improperly admitted,
caused the rendition of an improper judgment, because it is cumulative of other
testimony. Mancorp, Inc., v. Culpepper, 802 S.W.2d 226, 230 (Tex. 1990) (“When
erroneously admitted evidence is merely cumulative or does not concern a material
issue dispositive of the case, the error is harmless.”); Badger v. Symon, 661 S.W.2d
163, 164 (Tex. App.—Houston [1st Dist.] 1983, writ ref’d n.r.e.). 
D. Kerry O’Day
          Olympic complains of the following two instances at trial in which co-defendant O’Day opined that defective steel caused the rifle barrel to fail. O’Day
testified before the jury, without objection, as follows:
[O’Day’s Counsel]:        Did you - - did you hear where Mr. Schuetz
[Olympic’s owner] said that you should not
be putting .300 Weatherby Magnum chambers
on these .30 caliber barrel blanks?
 
[O’Day]:                          Yes, sir, I heard that in the deposition.
 
[O’Day’s Counsel]:        Now, you have already told us that you know
they knew that. But in your opinion, could
you put .300 Weatherby Magnum chambers
on these .30 caliber barrel blanks, had they
been made with adequate steel? 
 
[O’Day]:                          Oh, yes, sir. I have been doing it for many
many years.
 
Later during O’Day’s examination, the following exchange occurred without
objection:
[O’Day’s Counsel]:        Kerry, do you feel bad about this accident?
[O’Day]:                          Yes, sir, I do.
[O’Day’s Counsel]:        Do you feel like you are responsible for this?
[O’Day]:                          No, sir, I don’t.
[O’Day’s Counsel]:        Why not?
[O’Day]:                          If we would have had good steel in those
barrels, none of us would be here right now.

          Before trial, the trial court granted Olympic’s motion to exclude opinion
testimony from O’Day regarding metallurgical issues. O’Day also repeatedly testified
at trial that he was not a metallurgist. Green observes, however, that Olympic waived
its complaints regarding O’Day because Olympic elicited testimony to the same effect
from O’Day. The following exchange took place before the jury:
[Olympic’s Counsel]:      Now, in your deposition, you told me that it
was your position that the steel in that rifle
barrel did not meet the requirements for 416
steel. Do you recall that testimony?
 
[O’Day]:                          Again, you should probably talk to a
metallurgist about it; but I don’t believe it
meets the requirements for quality steel.
 
[Olympic’s Counsel]:      All right. Now, what you told me in your
deposition was this, “My opinion is the steel
given to Olympic Arms was probably not of a
416R or 416F manufacture.” Does that sound
accurate?
 
[O’Day]:                          Yes, sir.
 
[Olympic’s Counsel]:      Okay. Because had it been 416 stainless steel
it would have been fine, right?
 
[O’Day]:                          If it would have been quality 416 steel,
without the inclusions, it would have been
fine.

          Admission of improper testimony is waived if testimony to the same effect has
been permitted without objection. Symon, 661 S.W.2d at 164. Even if a trial court
erroneously admits evidence over objection, the error is harmless if the objecting
party subsequently permits the same or similar evidence to be introduced without
objection. Id. at 164–65. Olympic introduced the same or similar evidence, and thus
we hold that the admission of O’Day’s testimony, if error, was harmless. Id.
VI. Olympic’s Defensive Theories
A.      Substantial Alteration
          Olympic contends that O’Day substantially altered its rifle barrel in an
unforeseeable manner, and therefore we should render judgment, as a matter of law,
on each of Green’s products liability claims. Specifically, Olympic contends that
O’Day modified its rifle barrel by shortening the chamber end or “shank” of the rifle
too much, pushing the chamber forward into the barrel’s “taper.” Green responds that
Olympic concedes that it sells its Ultra Light Contour rifle barrel with the intent that
gunsmiths, like O’Day, shorten it to fit the cartridges it fires. Thus, Green contends,
O’Day’s alteration of Olympic’s barrel was reasonably foreseeable to Olympic, and
the evidence is legally sufficient to support the jury’s determination of Olympic’s
liability on Green’s product defect claims. 
          Substantial alteration of a product is a type of product misuse and an
affirmative defense for which the defendant bears the burden of proof. Placencio v.
Allied Indus. Intern., Inc., 724 S.W.2d 20, 22 (Tex. 1987). “Alterations or
modifications not reasonably foreseeable by the manufacturer or seller are sufficient
to preclude imposition of liability.” USX Corp. v. Salinas, 818 S.W.2d 473, 489 n.16
(Tex. App.—San Antonio 1991, writ denied). We therefore determine whether
Olympic has proved its substantial alteration defense as a matter of law.
          Foreseeable Use
          At the time of the accident, O’Day had purchased rifle barrels from Olympic
for approximately 17 years. He spoke with Olympic regarding the barrels that he
ordered and their possible uses. Before O’Day began to work with Ultra Light
Contour barrels, he telephoned Olympic and asked whether Olympic had any problem
with his using magnum cartridges on its ultra light tapers. Olympic assured O’Day
that there would be “no problem” with this use of its rifle barrel. O’Day testified that,
had Olympic informed O’Day that chambering its Ultra Light Contour barrels for use
with magnum calibers was hazardous, he would have found another supplier who
made rifle barrels that work with magnum cartridges or not produced this particular
rifle. O’Day further testified that Olympic was aware that he was chambering its
Ultra Light Contour barrels for use with magnum caliber bullets. 
          In order for Olympic’s product to be put to its intended use, a gunsmith must
incorporate Olympic’s rifle barrel into a rifle. Olympic admitted that its barrel blanks
“cannot be used for anything until Olympic’s customer . . . chambers the blank for the
ammunition intended for the custom rifle and fits the barrel to the action of the
custom rifle.” The gunsmith must thread the barrel so that it can be screwed into the
receiver on the rifle and then must “ream” or cut the chamber from the inside of the
barrel. A gunsmith then cuts a recess or “bolt cut” into the barrel, so that the bolt can
turn in the recess when rounds are inserted into or ejected from the chamber. 
Olympic acknowledged that gunsmiths make these alterations, but contends that
O’Day made them improperly. 
          In particular, Olympic presented evidence that O’Day’s modifications deviated
from recommendations promulgated by the Sporting Arms & Ammunition
Manufacturing Institute (“SAAMI”). For example, in its brief, Olympic admits that
O’Day was required to decrease the shank of the barrel blank it sold to O’Day by 0.50
inches in order to thread the barrel blank to the rifle’s action. According to Olympic,
however, O’Day decreased it by 0.925 inches. Similarly, when O’Day chambered the
barrel blank, he reduced the “throat dimension” to 0.136 inches, whereas SAAMI
recommends 0.361 inches as the minimum throat dimension. Olympic acknowledged
that the SAAMI recommendations are voluntary.
          O’Day denied that his alterations amounted to a misuse of the product and
testified that the shortened barrel improved accuracy. He also testified that Olympic
knew the degree to which he modified its barrels because if an Olympic barrel on a
customer’s rifle was inaccurate, he returned the inaccurate barrel to Olympic. These
returned barrels had been chambered and installed onto working rifles and thus
alerted Olympic as to the types of chambers and calibers that O’Day installed on its
barrel blanks, including .300 Weatherby Magnum cartridges. Thus, the jury heard
conflicting evidence about whether O’Day shortened the barrel to a degree to which
Olympic did not approve. The jury concluded that Olympic was 50% responsible for
the barrel explosion. 
          Although the jury heard contrary evidence on the matter, we find that legally
sufficient evidence exists to support its finding that Olympic foresaw, or should have
foreseen O’Day’s modifications. Therefore, we hold that Olympic has failed to prove
its substantial alteration defense as a matter of law on the basis of the unforseeability
of O’Day’s modifications.
          Multiple Parties Worked on the Rifle
          Alternatively, relying on Trevino v. Yamaha Motor Corp., 882 F.2d 182, 185
(5th Cir. 1989), abrogated on other grounds by Little v. Liquid Air Corp., 37 F.3d
1069, 1076 n.14 (5th Cir. 1994) , Olympic contends that we should render judgment
in its favor because O’Day is solely responsible for the alterations performed on its
barrel. A manufacturer of a component part is not liable for defects in the final
product if it does not participate in the integration of the component into the final
product and the component is not itself defective. Bostrom Seating, Inc. v. Crane
Carrier Co., 140 S.W.3d 681, 683 (Tex. 2004). In Trevino, the Fifth Circuit Court
of Appeals, relying on Elliott v. Century Chevrolet Co., 597 S.W.2d 563, 564 (Tex.
Civ. App.—Fort Worth 1980, writ ref’d n.r.e.), examined three factors to determine
responsibility for a defective product if the finished product is the result of substantial
work by multiple parties: (1) trade custom—at what stage would the defect normally
be cured; (2) relative expertise—which party is best acquainted with the design
problems of the product as modified; and (3) practical considerations—which party
is in the better position to remedy or warn of the defect. Trevino, 882 F.2d at 185.
          The evidence at trial included testimony that Olympic was aware that the
gunsmiths to whom it sells had to remove steel from the rifle barrel blanks that it
manufacturers and sells, and that, if too much steel is removed, then its product may
fail. Olympic, moreover, acknowledged at trial that it is acquainted with the
tolerances for stress of its product as modified. Finally, O’Day had returned Green’s
first rifle—one already machined—to Olympic, which replaced it. Green presented
evidence that Olympic knew and could warn of this potential hazard. In this instance,
Olympic’s duty to warn is commensurate with its knowledge of the intended use of
its product. See Wood v. Phillips Petroleum Co., 119 S.W.3d 870, 873–74 (Tex.
App.—Houston [14th Dist.] 2003, pet. denied). Relying on Trevino, Olympic further
contends that, although Green presented evidence that the barrel’s steel was full of
inclusions and imperfections, causing it to fail, we must assume that the inclusions
in the barrel did not cause it to fail and that O’Day’s work solely caused it to fail. 
Given our standard of review, however, which requires that we view facts in a light
favorable to the jury’s verdict, we hold that Olympic failed to prove, as a matter of
law, that it was the rifle barrel’s modification that caused it to fail. See Bostrom, 140
S.W.3d at 684.


 Green’s experts testified that it did not. We hold that legally
sufficient evidence supports Green’s claim that Olympic reasonably could foresee that
a gunsmith, such as O’Day, would order the Ultra Light Contour barrel blank and
perform the work that O’Day performed on the barrel to construct a custom rifle. 
Olympic thus fails to demonstrate that the trial court should have rendered judgment
for it, as a matter of law, based upon its substantial alteration defense.



B.      Sole Cause
          Olympic further contends that O’Day’s conduct was the sole producing cause
of Green’s injuries and that we thus should render judgment for Olympic as a matter
of law. Olympic contends that the evidence conclusively negates proximate cause
because no manufacturing defect existed and O’Day did not need, did not read, and
would not heed any warning about the proper use of Olympic’s product. As
discussed above, we reject Olympic’s contention that the evidence is legally
insufficient to support the jury’s findings that a causal nexus exists. In addition,
Olympic contends that the trial court erred in refusing to give an instruction regarding
a “sole cause” defense. Because we have reversed the judgment and remanded the
cause on Olympic’s comparative responsibility issue, we do not address Olympic’s
sole cause issue. 
 
 
 
 
 
 
 
 
VII. Conclusion
          Olympic timely requested that the trial court include its settling co-defendants
in the jury charge for the jury to assess responsibility for Green’s injuries. The trial
court refused Olympic’s request. Chapter 33 of the Civil Practice and Remedies Code
requires such a submission if the evidence raises an issue as to a settling party’s
responsibility. We conclude that the evidence raised such an issue and therefore hold
that the trial court erred in refusing to submit the settling parties for comparative
causation. We further hold that the omission is not harmless because it precluded the
jury from considering whether the settling defendants’ conduct contributed to Green’s
injuries. Finally, we hold that legally sufficient evidence supports Green’s claims and
that Olympic did not conclusively prove its defensive theories, so as to be entitled to
a rendition of judgment. We therefore reverse the trial court’s judgment and remand
the cause for a new trial.





                                                             Jane Bland
                                                             Justice

Panel consists of Justices Taft, Keyes, and Bland.